**Felix ROCHA, Appellant,**

v.

**The STATE of Texas.**

No. 73280.

Court of Criminal Appeals of Texas.

April 12, 2000.

Randy McDonald, Houston, for appellant.

Kelly Ann Smith, Asst. Dist. Atty., Houston, for State.

1. The provision states in relevant part: "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit ... robbery" (ellipses inserted).

*OPINION*

KELLER, J., delivered the opinion of the Court in which McCORMICK, P.J., and MANSFIELD, WOMACK and KEASLER, JJ., joined.

Appellant was convicted in November 1998 of capital murder (murder in the course of a robbery). Tex. Penal Code § 19.03(a)(2).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises fifteen points of error. We will affirm.

## I. SUFFICIENCY OF THE EVIDENCE

In point of error two, appellant contends that the State failed to prove the *corpus delicti* for the underlying offense of robbery. The *corpus delicti* rule is a rule of evidentiary sufficiency that can be summarized as follows: an extrajudicial confession of wrongdoing, standing alone, is not enough to support a conviction; there must exist other evidence showing that a crime has in fact been committed. *Williams v. State*, 958 S.W.2d 186, 190 (Tex.Crim.App.1997). This other evidence is commonly referred to as the "corpus delicti." *Id.* This other evidence need not be sufficient by itself to prove the offense: "all that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence." *Id.* (quoting *Chambers v. State*, 866 S.W.2d 9, 15–16 (Tex. Crim.App.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994)). We have held that, in a capital

2. Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

murder case, the *corpus delicti* requirement extends to both the murder and the underlying offense. *Williams*, 958 S.W.2d at 190. *But see Monterrubio v. State*, 916 S.W.2d 506 (Tex.Crim.App.1996)(Keller, J. dissenting).

The evidence shows the following: On November 26, 1994, Rafael Fuentes, the decedent, was working as a security guard at La Camelia, a nightclub in Harris County. Reynaldo Munoz, who owned some pool tables at the nightclub, arrived at around 7:00 p.m. Munoz talked to Fuentes for ten to fifteen minutes while Fuentes stood at the door to the club. Munoz noticed that Fuentes was wearing a holster containing a gun. Two men, a tall man and a short man, moved quickly toward Fuentes. Munoz moved out of the way as Fuentes stopped the men to conduct a search. Munoz saw the tall man raise his arms as if to permit a frisk. Then Munoz watched the short man pull out a gun, point the gun at Fuentes, demand Fuentes' gun,[3] and reach for Fuentes' gun. At that point, Munoz began to flee the scene and did not see what happened next. As he fled, Munoz heard two or three gunshots.

A police radio dispatch informed patrol officer Michael Junco of a shooting in progress. Junco arrived at the scene to find Fuentes' body with gunshot wounds. Junco noticed that there was no gun in Fuentes' holster.

The tall man was later identified as Virgilio Maldonado. The short man was believed by law enforcement officials to be appellant. Houston Police Officer X.E. Avila interviewed appellant. In his oral statements, appellant gave the following version of events: Appellant and Fuentes had been involved in an altercation at some time prior to the murder. Fuentes had beaten and otherwise embarrassed appellant, and appellant had vowed to get revenge. On the night of the killing, appellant and Maldonado confronted Fuentes.

Appellant intended to take Fuentes' gun to embarrass him and show that Fuentes was not a good security guard. Appellant pulled his own gun on Fuentes, and Fuentes grabbed appellant's gun. Then appellant and Fuentes struggled over appellant's gun, and appellant's gun was shot once during the struggle. Appellant did not know whether the shot hit Fuentes or simply went into the air. Maldonado shot Fuentes several times to protect appellant. Maldonado then took Fuentes' gun, and appellant and Maldonado fled the scene.

The *corpus delicti* for robbery was established by the testimony of Munoz and Junco. Munoz's testimony established that Fuentes was carrying a gun in his holster prior to being shot, that he was confronted by two persons, that one of these persons demanded and reached for Fuentes' gun, and that a shooting occurred afterwards. Junco's testimony established that Fuentes had been shot and that his gun was missing shortly after the shooting had occurred. This evidence tends to show that Fuentes' gun was stolen during a physical attack upon him and that the physical attack culminated in a murder. Point of error two is overruled.

## II. VOIR DIRE

### A. Defendant's Peremptories/Challenges for Cause

■ In point of error nine, appellant contends that the trial court erred in refusing to permit the retroactive exercise of a peremptory challenge. After the individual voir dire examination of David Kelley, both parties accepted Kelley as a juror. Later in voir dire, appellant requested that he be permitted to retroactively exercise a peremptory challenge against Kelley. The trial court refused the request. Without authority, appellant contends that the trial court's refusal violated his "due process rights to a fair and impartial jury."

---

**3.** Appellant's demand for the gun was made in Spanish. Munoz, who understood Span-

ish, heard and understood this demand.

▆▆ The Legislature has prescribed the procedure for exercising for cause and peremptory challenges by the parties in a capital case. Article 35.13.[4] Under this procedure, "the defendant must exercise peremptory challenges upon the examination of individual prospective jurors without the opportunity to evaluate the panel as a group." *Janecka v. State*, 739 S.W.2d 813, 833 (Tex.Crim.App.1987). Having followed the statutory procedure, the trial court cannot be held in error for failing to grant an out-of-time peremptory challenge. *Robison v. State*, 888 S.W.2d 473, 484 (Tex. Crim.App.1994), *cert. denied*, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). We have held that the statutory procedure does not violate due process. *Janecka*, 739 S.W.2d at 834; *Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex.Crim.App. 1996). Point of error nine is overruled.

▆▆ In points of error twelve through fifteen, appellant complains about the trial court's refusal to grant challenges for cause made by appellant against various members of the venire. However, appellant used only thirteen of his fifteen peremptory challenges. A defendant is not harmed by a trial court's erroneous refusal to grant defense challenges for cause if the defendant has failed to exhaust his peremptory challenges. *Anson v. State*, 959 S.W.2d 203, 204 (Tex.Crim.App.1997), *cert. dism'd*, 525 U.S. 924, 119 S.Ct. 290, 142 L.Ed.2d 241 (1998); *Narvaiz v. State*, 840 S.W.2d 415, 427 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). Points of error twelve through fifteen are overruled.

## B. State's Challenges for Cause

▆▆ In point of error ten, appellant claims that the trial court erroneously granted the State's challenge for cause against prospective juror Williams in violation of the constitutional proscription against excluding jurors with conscientious scruples concerning the death penalty. Under the United States Constitution, a prospective juror may be disqualified for having conscientious scruples about the death penalty only if his "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 425, 105 S.Ct. 844, 83 L.Ed.2d 841 (U.S.1985). We give deference to a trial court's decision to exclude a prospective juror and will reverse only for an abuse of discretion. *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim.App.1998). We will uphold the trial court's decision when a prospective juror's answers on a challenge for cause issue are "vacillating, unclear, or contradictory." *Id.*

We need not address appellant's "conscientious scruples" claim, however, because at least two other grounds for granting a challenge for cause against Williams are apparent. First, the juror stated that she could not answer the future dangerousness special issue:[5]

[Prosecution voir dire]

Q. The first question that's asked in a death penalty trial is whether there is a—a probability that the defendant will commit criminal acts of violence that constitutes a threat to society. Now, most people would—would think that they would look at what happened in the crime, maybe—maybe the defendant's past, the person that's been convicted, his past, if he has one, what other evidence. And they say, I could decide whether a person is

---

4. The statute provides:
 A juror in a capital case in which the state has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause.

5. That issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071 § 2(b)(1).

dangerous or not, even though that might lead to a finding that he should be put to death. Could you do that?

A. I don't know how I could determine that a person could be dangerous in the future.

Q. Well, assume—assume with me for a moment that that's possible for you to do?

A. All right.

Q. That that's possible for any human being to do. And look at it from this aspect. If I answer this question, yes—and looking at it from a point of view that there are three questions there, is one third of the way for that man to get the death penalty. From that aspect, could you give fair attention to that question? Or would your views affect the way you looked at that question?

A. Yes, they would.

. . . .

[Defense voir dire]

Q. Or are you saying that regardless of the amount of evidence that the prosecution has, regardless of the eyeball witnesses that they may have of other crimes, for example, from other crime victims and the behavior that, you know, maybe a person did, are you saying that you would—you could never answer Special Issue No. 1, yes?

A. I don't think I could. Because I still don't think I could, even based on what someone would tell me or show me, I don't believe I could choose to decide whether that person would do something in the future such as they've done in the past. Don't think it's a decision I could make.

Q. Okay. And you're saying that that's a decision—that that's not a decision that you think you can make? Are you saying that you would re-fuse to participate in the process to answer that question yes or no? Or are you saying that you could sit as a juror, go through the deliberation process that jurors go through when they're determining, you know, among themselves, all 12 discussing the case and determining whether that issue should be answered yes or no?

A. I think I would have trouble with that one.

Q. Okay. Well, it's okay for you to have trouble. In fact, every juror that sits there should have trouble answering all of these special issues. Okay? But the question is, could you, if you were persuaded, answer that special issue yes or no and give Mr. Rocha the benefit of your individual judgment based upon the evidence that you heard.

A. No.

Q. You could not do that?

A. No.

Q. Regardless of the circumstances?

A. No.

 This colloquy reveals a ground for challenge distinct from that articulated in *Witt.* Williams did not claim that her inability to answer the issue stemmed from her views about the death penalty. Instead, she simply claimed that the issue is not one that is susceptible to an answer because future behavior cannot be predicted. While distinct from a *Witt* challenge, this scenario nevertheless presents a valid challenge for cause. The State is entitled to a juror who will be able to answer the future dangerousness issue affirmatively in an appropriate case. *Chambers v. State,* 568 S.W.2d 313, 323–324 (Tex.Crim.App. 1978), *overruled on other grounds, Grijalva v. State,* 614 S.W.2d 420, 425 (Tex.Crim. App.1980). In *Chambers,* a prospective juror who was a statistician by profession stated that the future dangerousness issue could not be determined by reason and logic and that, from a statistical stand-

point, whether an act will probably occur in the future cannot be proven beyond a reasonable doubt. *Id.* We found the statistician to be challengeable for cause. *Id.* at 324. Similarly, Williams showed an inability to answer the future dangerousness issue based upon the belief that future dangerousness is an issue incapable of determination. She was challengeable for cause on that basis.

Williams was also challengeable for cause because she could never consider the death penalty for a murder committed in the course of a robbery:

> [Prosecution voir dire]
>
> Q. A capital murder trial. A capital murder is the intentional killing of another human being during a robbery, sexual assault, killing of a police officer while a police officer in the line of duty. There are other crimes, but those are—are three of them. Do you feel that those crimes warrant a sentence as grave as the death penalty?
>
> A. Part of them.
>
> Q. Which ones do you not agree with?
>
> A. I'm not so sure about the robbery.
>
> Q. The case that's here?
>
> A. In general. In general.
>
> Q. In general?
>
> A. Not particularly.
>
> Q. Right.
>
> A. I have—I really have specific concepts as to what crimes I would think would allow someone to be put to death.
>
> Q. What's alleged in the indictment here is the killing of one person during a robbery. Do you think you could ever vote for the death penalty in a case that involved the killing of one person during a robbery?
>
> A. No.

A prospective juror is challengeable for cause if that person would never vote to give the death penalty for a statutorily classified capital murder offense because the person does not accept that offense as a valid criteria for imposing a sentence of death. *Howard v. State*, 941 S.W.2d 102, 128 (Tex.Crim.App.1996)(juror would be properly excludable if unwilling to consider the death penalty for murder in the course of a burglary); *Fuller v. State*, 829 S.W.2d 191, 199–200 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993)(prospective juror properly excluded because she was unwilling to consider the death penalty except in serial murders).

In challenging Williams for cause, the State commented that "she is unqualified to serve on this jury on more than one point." Although defense counsel objected to Williams' disqualification, he conceded that Williams' answers to questions concerning the future dangerousness issue raised valid concerns: "I can see the Court's concern, perhaps prosecutor's concern over that answer, that first special issue the way she does." The trial court had more than sufficient grounds to grant the State's challenge for cause. Point of error ten is overruled.

 In point of error eleven, appellant claims that the trial court erroneously granted the State's challenge for cause against prospective juror Fowler in violation of the constitutional proscription against excluding jurors with conscientious scruples concerning the death penalty. In support of his contention that prospective juror Fowler was qualified, appellant sets forth the following colloquy from the record:

> [Prosecution voir dire]
>
> Q. Do you—do you have some—I hear you say, that you don't feel like you can judge? Is that based on a— religious belief? Or just a personal code that you have?
>
> A. Well, basically, on a religious belief, really.

Q. Okay. And I take it, then, that it's based on an admonition that is in the form of, judge not—

A. Yes.

Q. less [sic] you be judged?

A. Yes.

Q. That is what you believe?

A. Yes.

Q. You understand that—that as people, we do this all the time. That almost every culture in the world has some system where they judge at least disputes between people and assign blame or punishment or demand, you know, compensation for wrongs, at the very least?

A. Yes.

Q. Do you feel like despite how you feel about judgment that—that you could participate in this, in this civil—I know it's a criminal court—but in the citizen's exercise of judgment?

A. Well, yes, I do. I feel I can, if I have to.

Q. All right. And what do you—what do you mean, you have to?

A. I say if, you know—it's an honor to serve. That's what I mean. If I have to, if I'm chosen, yes, I can.

Q. All right. So you don't have a—you don't have a belief that's—that's so fundamental that you would have to refuse to take an oath as a juror?

A. No, I don't.

Q. Okay. And you—but you do have—you are having a problem putting—putting yourself in a position of judging somebody else?

A. Yes I am.

Q. Okay. How do you feel you could—do you feel like you could carry out—do you feel like you could go through the process and do this process?

A. Yes.

From this passage, appellant concludes: "Because Ms. Fowler's personal views would not have prevented or impaired the performance of her duties she should not have been excused, and the trial court erred."

Appellant omits crucial portions of the record. Before Fowler's individual voir dire began, the trial judge elicited concerns from her about deciding a death penalty case:

THE COURT: I'd also indicated I was going to ask everybody whether they felt you had a moral or religious, conscientious scruple that would keep you from being able to fairly and accurately answer the questions presented to you in the course of a capital murder case. Do you have a situation like that?

PROSPECTIVE JUROR: Well, I think I do. I don't feel like I can judge, because I don't know. You know, it's—how can I say this? I don't feel like I can judge anybody, because if it was on the other hand and my son was in the situation, I really don't think I could.

The colloquy that appellant outlines follows the Court's question and would appear to rehabilitate Fowler. But, appellant neglects to include the voir dire immediately following Fowler's affirmation that she can "go through the process":

[Prosecution voir dire]

Q. Okay. I notice that—and we really didn't address it with the Judge. You told him how you feel about that. You really don't. Do you have any objection to the death penalty?

A. Yes.

Q. Okay. What—what is—how would you state your objection to the death penalty?

A. I don't feel like I can rule. That if the person is found guilty, I really don't think I can. It will be on my conscience if they would get the death penalty.

Q. Right.

A. I couldn't live with that.

Q. I notice, however, that you—in the questionnaire you—you stated that or you answered that the option that you—you really did not have a problem with the death penalty. That you thought that it had a valid place.

A. In certain cases.

Q. Okay. So you don't have an objection to all—all the death penalty? But you, yourself, don't feel like you could participate?

A. No, I don't.

Q. Is your feeling so strong that you would tell the Judge that you cannot take the oath and participate in a death penalty trial?

A. Yes.

Q. I'm sorry. All right. And you understand, nobody—the laws doesn't make—put you in a position where, you know, you are—you know, where they force you to take an oath that you cannot comply with. So it's okay. It's fine for you to say that. But—but if given the option not to participate, you feel like your beliefs about the death penalty will cause you not to participate? Cause you tell the judge that, I cannot take that oath because I personally cannot participate in death penalty trial?

A. Yes.

Q. Is there anything else you wanted to tell me about your feelings about that?

A. Well, it's—my heart goes out to anybody's son, because I have only one child. And if he do something wrong, it will hurt me. And it hurt me about the other person, because I know how they feel about their child, too. So I really, like I said, it will be on my conscience in a death penalty because I couldn't live with that. Knowing I did that.

Defense counsel asked no questions.

The record contains ample support for the conclusion that Fowler's views about the death penalty would in fact substantially impair her ability to decide the case in accordance with her oath as a juror. The trial court did not abuse its discretion in granting the State's challenge for cause. Point of error eleven is overruled.

## III. MOTION TO SUPPRESS

### A. Failure to Make Written Findings

■ In point of error one, appellant contends that the trial court erred in failing to file written findings of fact and conclusions of law. We granted the State's motion to abate and remand the case to file such findings and conclusions. Pursuant to our remand order, the trial court filed written findings of fact and conclusions of law regarding appellant's motion to suppress his confession. Point of error one is overruled as moot.

### B. Voluntary Waiver of Warnings

In points of error three and four, appellant contends that the trial court should have suppressed certain oral statements under Articles 38.22 and 38.23. He advances two arguments in support of this contention. First, appellant argues that the State failed to comply with Article 38.22 because, while the transcription of the recorded conversation shows that the required warnings were given, the transcription does not show that appellant waived his rights. Second, appellant asserts that the record shows his confession to be involuntary because (1) he did not understand his rights, (2) the officer promised to help appellant if he did what the officer said, and (3) the officer told appellant what to say.

#### 1. *The Facts*

According to the trial court's findings and our review of the record, the following

occurred:[6] Houston Police Homicide Detective Xavier Avila was assigned to interview the defendant in connection with a bank robbery that had occurred on April 11, 1996. Shortly after the bank robbery, while appellant was in the hospital recovering from a gunshot wound, Avila conducted an oral interview that was recorded on audiotape. At the beginning of the interview appears a colloquy regarding appellant's rights:[7]

> INV. AVILA: What is your name?
>
> CHANOCUA: Benito Chanocua.[8]
>
> INV. AVILA: Benito Chanocua? Uh, Benito, uh, before continuing with this interview we need to notify you of your legal rights. Uh, can you read Spanish?
>
> CHANOCUA: Yes.
>
> INV. AVILA: O.K. Uh, here on this card I have the, your legal rights uh are in Sp . . . written in Spanish uh, read me your first right.
>
> CHANOCUA: You have the right to maintain your silence and say absolutely nothing of statement that you may make may be used against you in cause in that which is accused. Two, any, any statement that you make may be used as evidence against you in court. You have right to have an attorney present for him to advise you before you are questioned, during the time you are being questioned. If you cannot employ an attorney you have the right to have one assigned to you . . . advise you during the time you are questioned. You have the right to terminate this interview at any time that you that . . . desire.
>
> INV. AVILA: O.K. Do you understand your rights?
>
> CHANOCUA: Yes.
>
> INV. AVILA: O.K. uh, I want you to to give us a statement of of of what happened, uh, you are giving us this statement voluntarily. No one is forcing you to, to tell us what what it was that happened? Yes or No?
>
> CHANOCUA: Yes.
>
> INV. AVILA: Yes? Then this is what? It is voluntary?
>
> CHANOCUA: Is it being asked?

(All "..." in original). After this colloquy, the interview proceeded. The subject of the interview was the bank robbery.

On April 24, 1996, Detectives Avila and Jaime Escalante went to the Harris County Jail to interview appellant, who was already in custody for aggravated robbery. Appellant, however, asked them to return the following day. The following day, April 25, 1996, Detective Avila returned to the jail to interview appellant alone. Detective Avila was not in uniform and carried no weapons when he met with appellant.

Upon appellant's arrival in the jail interview room, Detective Avila introduced himself and said that he was investigating a homicide. He told appellant that his eventual co-defendant, Virgilio Maldonado, had already given a statement, in which he implicated appellant, and Detective Avila played a short part of that statement for the appellant. After hearing the recording, appellant indicated he wished to make a statement as well. Detective Avila then activated his audio-tape recorder. Immediately after activating the recorder, Detective Avila read appellant his legal rights and warnings, and appellant indicated that he understood: appellant verbally ac-

---

6. Our summary of the facts is taken almost verbatim from the trial court's findings of fact. In addition to the trial court's factual summary, we have inserted discussions about the contents of the two oral statements made by appellant. Those statements were State's exhibits at the pretrial hearing. We have substituted "appellant" for the trial court's use of "the defendant" in the factual summary.

7. Both of the oral interviews with appellant were conducted in Spanish. We quote from the English translation.

8. Appellant was also known as Benito Chanocua.

knowledged that he understood each individual right and indicated to Detective Avila that he wished to voluntarily waive those rights and make a statement. The translated transcription of this colloquy appears as follows:

> INV. AVILA: O.K. uh, uh, can you tell ... take this, here, you can speak into this. Tell me what happened uh, about the uh, this incident about a guard, uh, let me read you your legal uh, rights uh, first. First, you have the right to maintain your silence and say absolutely nothing. Any statement that you make may be used against you in the cause in which you are accused. Do you understand?
>
> CHANOCUA: M-hm.
>
> INV. AVILA: O.K. Number two is: Any statement that you make may be used as evidence in the cour ... in the court against you. Do you understand? Yes? No ... you have to speak so that ...
>
> CHANOCUA: Yes I understand.
>
> INV. AVILA: O.K. Number three is: you have the right to have an attorney present to advise you before, and during the time you are being questioned. Do you understand?
>
> CHANOCUA: I understand.
>
> INV. AVILA: Number four, if you cannot employ an an attorney you have uh ... an attorney ... you have the right to have an attorney appointed to you so that he may advise you before or while you are questioned. Do you understand?
>
> CHANOCUA: Yes, I understand.
>
> INV. AVILA: Number five, you ... uh..you have the right to terminate this interview at any time that you say. Do you understand?
>
> CHANOCUA: I understand.

(All "..." in original). Thereafter, appellant's statement was recorded on audiotape.

At no time did appellant ever indicate that he wished to speak with a lawyer or otherwise have a lawyer present. Nor did Detective Avila directly or indirectly promise appellant anything or otherwise induce him to give his statement. Moreover, appellant was in no way threatened or coerced into speaking with Detective Avila, and Detective Avila never promised appellant anything in return for his statement.

The trial court found that appellant's claims that he did not understand the *Miranda* warnings read to him by Detective Avila to be not credible. The trial court also found that the audio recording of appellant's statement satisfied the requirement set forth in Article 38.22 and that the recording was true and correct and had not been altered. The trial court also found the written transcription of appellant's statement to be true and correct. The trial court concluded that appellant's statement was not made as the result of any promises, threats, or coercion.

### 2. *Analysis*

The second oral statement is the focus of appellant's complaint. Appellant is correct that the record shows that no express waiver of his rights appears on the recording. However, the law does not require that the recording reflect an express waiver of the rights. *Etheridge v. State*, 903 S.W.2d 1, 16 (Tex.Crim.App. 1994), *cert. denied*, 516 U.S. 920, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995). Appellant's remaining contention regarding the voluntariness of his statement depends upon facts that were resolved by the trial court against appellant's position. After reviewing the record, we find that the evidence is sufficient to support the trial court's factual rendition. Although appellant introduced conflicting evidence, the trial court found that evidence to be not credible. We give almost total deference to a trial court's resolution of the historical facts, especially when that resolution turns on the credibility of witnesses. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). Points of error three and four are overruled.

## C. Vienna Convention

In point of error five, appellant contends that the trial court should have suppressed his oral statements under Article 38.23 because law enforcement officers failed to give him warnings required by the Vienna Convention. "The Vienna Convention on Consular Relations grants a foreign national who has been arrested, imprisoned or taken into custody a right to contact his consulate and requires the arresting government authorities to inform the individual of this right 'without delay.'" *Maldonado v. State*, 998 S.W.2d 239, 246–247 (Tex.Crim.App.1999)(citing Vienna Convention on Consular Relations, April 24, 1963, art. 36(1)(b), 21 U.S.T., 77, 100–101, 595 U.N.T.S. 261, 292 (ratified by the United States on Nov. 24, 1969)).

A Vienna Convention claim has been raised before this Court on two previous occasions. In *Ibarra v. State*, 11 S.W.3d 189 (Tex.Crim.App.1999), we rejected a defendant's claim as being procedurally defaulted, because the defendant did not complain about the issue until a hearing on his motion for new trial. *Id.* at 197–98. In *Maldonado*, we observed that a violation of the Vienna Convention treaty "would *arguably* fall under the language in Article 38.23(a)" because states must adhere to treaties under the Supremacy Clause of the United States Constitution "and give them the same force and effect as any other federal law." 998 S.W.2d at 247 (emphasis added). But we did not have to determine whether the treaty did in fact fall within the language of Article 38.23. We rejected the defendant's claim because the evidence did not establish that the defendant was in fact a foreign national,

and hence, no violation of the Vienna Convention treaty was established. *Id.* at 247. In the present case, appellant raised the issue in his written motion to suppress his confession, which the trial court denied by written order. Moreover, there existed ample, uncontroverted evidence that appellant was in fact a Mexican citizen.[9] And the evidence is undisputed that appellant was in custody during the oral interview conducted on April 25, 1996. Further, the undisputed evidence established that appellant was not informed of his rights under the Vienna Convention.

We find it appropriate to address now the issue left open in *Maldonado:* Does Article 38.23 provide a remedy for violations of the Vienna Convention treaty? To answer this question, we must decide whether Article 38.23's exclusionary rule applies to treaties. Article 38.23(a) provides in relevant part:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

The key issue is whether the word "laws," as used in this statute, includes treaties.[10]

We begin with the cardinal rule of statutory construction in Texas: a statute is to be interpreted solely in accordance with the plain meaning of its language, unless the language is ambiguous or the plain meaning leads to absurd results. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991). In Article 38.23, "laws" is placed in a series with "Constitu-

9. Avila testified that appellant told him before he took appellant's statement that appellant was a Mexican citizen. Further, Avila testified that appellant's primary language was Spanish and that appellant could not speak English. Appellant's oral statements were taken in Spanish. At the pretrial motion to suppress, appellant also testified that he was in fact a Mexican citizen. The State presented no controverting evidence concerning appellant's citizenship.

10. The State concedes in its brief that a treaty is a "law." We are not required to accept such a concession, however, because it concerns the construction of a statute—a matter this Court must ultimately determine for itself. *Long v. State*, 931 S.W.2d 285, 289 (Tex.Crim.App.1996).

tion." The Supremacy Clause of the United States Constitution also places "laws" in a series with other terms:

> This *Constitution*, and the *Laws* of the United States which shall be made in Pursuance thereof; and all *Treaties* made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

United States Constitution, Article VI, Clause 2 (also known as the "Supremacy Clause")(emphasis added). The Supremacy Clause indicates that "constitution," "laws," and "treaties" all constitute separate items that are in turn the "supreme law of the land." When used in a series, then, "laws" would appear to be distinct from treaties. On the other hand, "law," when used as an overarching concept, encompasses constitutions, laws, and treaties. Because "laws" and "Constitution" both appear in Article 38.23, the narrower meaning of laws, as being distinct from treaties, would appear to apply. To hold otherwise would render the word "Constitution" redundant in Article 38.23 because a constitution and a treaty both constitute "law" in the broad usage of that word. "We generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible." *State v. Hardy*, 963 S.W.2d 516, 520 (Tex.Crim.App.1997).

The orthographic difference between "laws" and "law" should also be noted. In the Supremacy Clause, "laws" is used as a countable plural that refers to statutes. On the other hand, "law" is used by the Supremacy Clause as a collective noun—a singular noun referring to plural objects—to refer to several different types of governmental commands (i.e. constitution, statutes, treaties). Under Supremacy Clause usage then, constitutions and treaties are "law" but are not "laws." Article 38.23 uses the countable plural "laws"—an indication that the provision refers to statutes and not to "law" in a more general sense.

Professors Dix and Dawson suggest that, "Given the construction of 'laws' of Texas, 'laws' of the United States probably means federal statutes." George E. Dix and Robert O. Dawson, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 4.44 (1995). In their view, "[L]aws of the state of Texas," as that is used in Article 38.23 of the Code of Criminal Procedure, is limited to legal requirements 'promulgated by the Legislature,' i.e. statutes." *Id.* at § 4.45. In the supplement, they note the existence of, but do not take a position on, the issue of whether a treaty constitutes a "law" under Article 38.23. Dix and Dawson, § 4.44 (Supp.1999).

We have held that disciplinary rules do not constitute "laws" under Article 38.23, but that privileges may, depending upon the circumstances. *Compare Pannell v. State*, 666 S.W.2d 96 (Tex.Crim.App.1984)(disciplinary rule) *to Henderson v. State*, 962 S.W.2d 544, 553–554 (Tex.Crim.App.1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998)(attorney-client privilege). That privilege rules may be considered "laws" is due in part to their statutory lineage. *Henderson*, 962 S.W.2d at 553 (privileges derived from rulemaking power given to this Court to replace legislatively drafted statutes); *see also* Dix and Dawson, § 4.45 (Supp.1999).[11]

---

11. Judge Holland's reasoning that the word "laws" includes treaties because treaties constitute the "supreme law of the land" is circular. The question is not what the Constitution means by "laws" but whether "laws," as that term appears *in Article 38.23*, is used in the narrow sense to mean statutes (or statutorily-derived rules) or in the broad sense to mean "supreme law of the land." One cannot reach Judge Holland's conclusion unless one presupposes from the outset that "laws" in Article 38.23 refers to "supreme law," the very fact we are attempting to ascertain. Similarly, Judge Holland's reasoning that Ar-

In addition, the Federalist Papers, written by the framers of the United States Constitution, draw a clear distinction between treaties and legislative enactments:

> I venture to add, that the particular nature of the power of making treaties indicates a peculiar propriety in that union. Though several writers on the subject of government place that power in the class of executive authorities, yet this is evidently an arbitrary disposition; for if we attend carefully to its operation, it will be found to partake more of the legislative than of the executive character, *though it does not seem strictly to fall within the definition of either of them.* The essence of legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of society; while the execution of the laws, and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive magistrate. *The power of making treaties is, plainly, neither the one nor the other. It relates neither to the execution of the subsisting laws, nor to the enaction of new ones;* and still less to the exertion of the common strength. *Its objects are CONTRACTS with foreign nations, which will have the force of law, but derive it from the obligations of good faith. They are not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign. The power in question seems therefore to form a distinct department, and to belong, properly, neither to the legislative nor to the executive.*

Alexander Hamilton, THE FEDERALIST PAPERS, No. 75 (italics added, capitalization in the original). Treaties are agreements between sovereigns rather than regulations of a sovereign's subjects.[12] If a

---

ticle 38.23 applies to Vienna Convention violations because foreign nationals are entitled to the protections of the state criminal justice system is also circular. Application of Article 38.23's exclusionary rule to Vienna Convention violations is "a protection of the state criminal justice system" *only if* treaties in general, and this treaty in particular, are in fact covered by Article 38.23, the very fact we are attempting to ascertain.

12. Quoting *Valentine v. U.S. ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936) and *Quintero v. State*, 761 S.W.2d 438 (Tex. App.—El Paso 1988), Judge Holland further contends that Supreme Court and Texas case-law hold that a treaty is "the equivalent of" a statute, and therefore, that a treaty must be a "law" under Article 38.23. We think this contention misconstrues the Supreme Court's use of the word "equivalent" in its opinion. The word "equivalent" has several definitions, including: (1) equal in force or amount, and (2) like in signification or import. Webster's Third New International Dictionary, 1969, p. 769. When the Supreme Court stated in *Valentine* that a treaty is "to be regarded in courts of justice as equivalent to an act of the legislature," 299 U.S. at 10, 57 S.Ct. 100, the Court did not appear to be saying that a treaty *is* a statute but that a treaty is *on equal footing with a statute*—that is, the Supreme Court was using the first Webster's definition rather than the second. In *Quintero*, the El Paso Court of Appeals addressed whether the violation of an extradition treaty rises to the level of an abuse that "shocks the conscience" under the Due Process Clause of the Fourteenth Amendment. 761 S.W.2d at 441. In connection with that claim, the El Paso court stated, "extradition treaties are equivalent to statutes. They are, therefore, despite their international political character, not the supreme law of this land." *Id.* The latter sentence stating that a treaty is not "supreme law" would seem, in isolation, to be patently false, given the wording of the Supremacy Clause. The sentence makes sense, however, if it is read simply to mean that treaties have power equal to statutes but subordinate to the Constitution.

And the structure of the language used by the courts is important. That treaties are "equivalent to" statutes (equal in power) does not mean that treaties are "the equivalent of" statutes (like in signification). That a treaty is equal to a law does not mean that a treaty is the same as a law. And, though a treaty is equal in power to a law, if it be not a law, then a provision that applies only to "laws" cannot apply to treaties, despite their equal status. To say otherwise would be like saying that a provision applying to the Court of Criminal Appeals must necessarily apply also to the Texas Supreme Court simply because the two courts are equal in power.

contract between sovereigns is broken, the party ordinarily expected to seek redress is the sovereign, not an individual subject:

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamation, so far as the injured parties choose to seek redress.... It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*United States v. Li*, 206 F.3d 56, 60–62 (1st Cir., en banc, 2000)(quoting *Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884))(ellipsis in *Li* ). Article 38.23 would seem ill-suited to address intersovereign disputes, and there is no reason to believe that the Texas Legislature ever anticipated that Article 38.23 would be used to enforce a treaty.

In evaluating a statute with ambiguous language, we are empowered to look at the object sought to be attained by the provision in question and the consequences of a particular construction. Tex. Gov't Code § 311.023(1) & (5); *Lane v. State*, 933 S.W.2d 504, 514–516 (Tex.Crim.App.1996). Perhaps in this vein, Judge Holland contends that there are "compelling policy reasons" for enforcing this provision of the Vienna Convention through Article 38.23's exclusionary rule. In support of her contention, Judge Holland relies heavily upon pronouncements by the State Department concerning the importance of complying with the Vienna Convention rules. However, the State Department takes the position that suppression of evidence is an inappropriate remedy for a violation of this provision of the Vienna Convention. *United States v. Lombera–Camorlinga*, 206 F.3d 882, 887–88 (9th Cir., en banc, 2000); *United States v. Li*, at 63–64.[13]

Strong policy interests might be implicated if our decision prevented the reciprocal enforcement of the treaty's protections to United States citizens in other countries. Judge Holland contends that the "treaty is an important protection to Texans traveling in other nations. This State should extend the *same* protections to for-

---

13. Judge Holland contends that we cannot rely upon the State Department's position letter because it was prepared in the course of litigation. For several reasons, we disagree. First, the State Department's position letter was submitted in response to an inquiry from the First Circuit, not because the Department was attempting mitigate the consequences of a mistake. *Li*, at 63. Second, the State Department is not a prosecutorial agency. While an allegation of a partisan motive might have some force when leveled against one of the parties to litigation, the State Department has no apparent motive to take one side or the other in a criminal case. Third, and perhaps most important, the position taken by the State Department does not appear to be new. "In 1989, a letter from a Department legal adviser informed a foreign national that '[w]hile the U.S. authorities are required to comply with the obligations [of Vienna Convention Article 36], failure to do so would have no effect on [his] conviction or incarceration.' " *Li*, at 64 (bracketed material in *Li* ). In 1998, when Mexico sought an advisory opinion from the Inter–American Court of Human Rights about the availability of criminal remedies for failing to give the proper consular notification, counsel for the State Department argued that the Vienna convention "does not require the domestic courts of State parties to take any actions in criminal proceedings, either to give effect to its provisions or to remedy their alleged violation." *Li*, at 64 (quoting Written Observations of the United States of America, Request for Advisory Opinion, OC–16, June 1, 1998 (corrected June 10, 1998)). And to the State Department's knowledge, the United States has never asked a foreign court to consider a failure of consular notification during deliberation on a criminal case. *Li*, at 64–66.

Moreover, even if the State Department's opinion were as suspect as Judge Holland claims, that opinion would be entitled to some weight for a treaty that is, at best, ambiguous concerning the appropriateness of applying an exclusionary sanction. *Lombera–Camorlinga*, at 887–88 And more to the point, the State Department's position on the matter seriously undercuts Judge Holland's attempt to rely upon other pronouncements by that same agency as support for imposing an exclusionary remedy.

eign nationals in Texas that we expect to be extended to our citizens when they are abroad" (emphasis added). But this contention assumes that foreign countries enforce the Vienna Convention through their own exclusionary rules. They do not: "The State Department also points out that no other signatories to the Vienna Convention have permitted suppression under similar circumstances, and that two (Italy and Australia) have specifically rejected it." *Lombera–Camorlinga*, at 888; *see also Li*, at 64–66[14] Our refusal to enforce an exclusionary rule for Vienna Convention violations would actually promote harmony in the interpretation of this international agreement. *Id.*

And, in en banc opinions, the First and Ninth Circuits recently decided that exclusion of evidence is an inappropriate remedy for a violation of the Vienna Convention provision at issue. *Li*, at 58–59; *Lombera–Camorlinga*, at 885–86. These cases

14. Additionally, to the extent that enforcement of the Vienna Convention is contended to be necessary to protect a defendant's right to counsel and other rights guaranteed by *Miranda*, such a contention is also flawed. The Vienna Convention Treaty was drafted three years before *Miranda* was decided, and most countries do not provide the kinds of protections during police interrogation that are mandated by *Miranda*. *Lombera–Camorlinga*, at 885–86.

15. Judge Holland responds by pointing to Delaware as "at least one other jurisdiction that has already enforced the Vienna Convention through exclusionary rule jurisprudence." But our point is *not* that there are no jurisdictions within the United States that are *currently* enforcing the Vienna Convention through an exclusionary rule; instead, our point is that, after a Supreme Court decision on the issue, we may *become* the only jurisdiction to do so. The Delaware decision is based solely on federal law grounds, *see generally State v. Reyes*, 740 A.2d 7 (Del.Super.1999), and would therefore be nullified by a Supreme Court decision holding that an exclusionary rule does not apply. Also, the *Reyes* decision, being from an intermediate court, is entitled to limited consideration.

Moreover, the Ninth Circuit's recent en banc opinion in *Lombera–Camorlinga* demolishes the foundations upon which the Delaware opinion was decided. The Delaware

may well find themselves in the United States Supreme Court. If we find, now, that the Vienna Convention treaty must be enforced through the exclusionary rule provided by Article 38.23, Texas may soon find itself to be the *only* jurisdiction in the entire world that enforces the treaty through the use of an exclusionary rule sanction.[15] It is difficult to see how such a state of affairs would do anything to ensure the protection of Texans abroad.

Relying upon the Vienna Convention Treaty's preamble, the Supreme Court of Virginia has held that the treaty creates no "legally enforceable individual rights" but "merely deals with notice to be furnished to the consular post of a foreign state." *Kasi v. Commonwealth*, 256 Va. 407, 508 S.E.2d 57, 64 (1998), *cert. denied*, — U.S. ——, 119 S.Ct. 2399, 144 L.Ed.2d 798 (1999).[16] The State Department takes the same position:

court relied heavily upon the panel opinion in *Lombera–Camorlinga*, which was overturned by the Ninth Circuit's en banc opinion in that case. *See Reyes*, 740 A.2d at 12–13 (relying upon Ninth Circuit panel opinion *United States v. Camorlinga*, 170 F.3d 1241, 1242–43 (9th Cir.), *withdrawn*, 188 F.3d 1177 (9th Cir. 1999)); *Lombera–Camorlinga*, 206 F.3d 882, 883–84 (2000)(overturning panel opinion due to contrary conclusion). In addition, the Delaware court relied upon two other Ninth Circuit cases involving an INS regulation enacted to implement the Vienna Convention. *Reyes*, 740 A.2d at 10–11 (discussing *United States v. Rangel–Gonzales*, 617 F.2d 529 (9th Cir.1980) and *United States v. Calderon–Medina*, 591 F.2d 529 (9th Cir.1979)). But the Ninth Circuit's en banc opinion in *Lombera–Camorlinga* found those cases to be distinguishable and stated that they were "only tangentially relevant to the question of whether a violation of a treaty can be remedied by exclusion of evidence in a criminal prosecution." 886–87 (discussing *Rangel–Gonzales* and *Calderon–Medina*).

16. The Vienna Convention preamble states in relevant part that "the purpose of such privileges and immunities [conferred by the Vienna Convention Treaty] is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States" (bracketed material inserted).

The [Vienna Convention] and the US–China bilateral consular convention are treaties that establish state-to-state rights and obligations.... They are not treaties establishing rights of individuals. The right of an individual to communicate with his consular official is derivative of the sending state's right to extend consular protection to its nationals when consular relations exist between the states concerned.

*Li*, at 63 (quoting Department of State Answers to the Questions Posed by the First Circuit in *United States v. Nai Fook Li* at A–3)(bracketed material and ellipsis in *Li* ). The State Department position continues:

The [only] remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political, or exist between states under international law.

*Id.* (bracketed material in *Li* ).[17]

Likewise, the First Circuit has found that the Vienna Convention is "facially ambiguous on the subject of whether [it] creates individual rights at all," and its preamble "explicitly disclaims any attempt to create individual rights." *Li*, at 62. If, in fact, the Vienna Convention Treaty does not create *individual* rights, then the "core rationale" for applying Article 38.23 would not be met. *See Chavez v. State*, 2000 WL 21091, *4 (Tex.Crim.App. 2000)(Price, J. concurring). The First Circuit did not decide whether the Vienna Convention Treaty actually conferred individual rights, *see Li*, at 59–60, and neither do we. That the Vienna Convention Treaty *may* not confer any rights at all is a reason to be circumspect about enforcing such a treaty as a "law" through Article 38.23.

Moreover, a holding that Article 38.23 does not apply to treaties does not mean that there is no enforcement mechanism for the Vienna Convention provision.

"The State department indicates that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary." *Lombera–Camorlinga*, at 887. In light of the State Department's activities, the Ninth Circuit has suggested that judicial enforcement of an exclusionary rule may result in a conflict between the executive and judicial branches. *Id.* at 887–88. A concurring opinion in the First Circuit has gone even farther, suggesting that judicial activity in this arena could seriously hamper United States' foreign policy:

There is an elaborate regime of practices and institutions by which the United States and other nations enforce commitments *inter sese* or decide that, in the national interest, promises given by or to another sovereign should not be enforced in a specific case. Sometimes this is done purely for reasons of prudence, sometimes for convenience, or sometimes to secure advantage in unrelated matters. Incalculable mischief can be wrought by gratuitously introducing into this often delicate process court enforcement at the instigation of private parties. We believe that such a course is to be avoided unless it can be said that private enforcement was clearly agreed to and envisioned by the contracting States in the treaties themselves. That is plainly not the case here [with the Vienna Convention].

*Li*, at 68 (Selya and Boudin, JJ. concurring). "[W]hen foreign affairs are involved, the national interest has to be expressed through a single authoritative voice. That voice is the voice of the State Department, which in such matters speaks for and on behalf of the President." *Id.*

---

17. On October 7, 1969, a State Department legal adviser submitted, in connection with testimony on the Vienna Convention, a written statement to the Senate Committee on Foreign Relations that emphasized the preamble's statement that the treaty's purpose is "not to benefit individuals." *Li*, at 64–66.

 Finally, holding that Article 38.23 does not apply to treaties does not preclude the application of a federal exclusionary rule. If the United States Supreme Court decides that all jurisdictions in the United States must enforce Vienna Convention violations through an exclusionary rule, then this Court would be bound, under the Supremacy Clause, to give effect to that holding. *See, for example, Baker v. State,* 956 S.W.2d 19, 24 (Tex.Crim.App.1997)(*Miranda* violations not enforceable under Article 38.23 although enforceable under federal exclusionary rule principles). A treaty that can be enforced under the Supremacy Clause should not be dependent upon *state* law for its implementation.[18]

 The effect of a treaty and the consequences of its violation are ultimately federal questions that only the United States Supreme Court can finally and definitively answer. We ordinarily think of state legislatures as free to confer upon individuals more expansive protection than that conferred by the federal government. But legislation conferring more remedies than a treaty actually confers could conceivably violate the Supremacy Clause if that legislation were found to be contrary to the language and the purpose of the treaty, because international treaties are exclusively federal matters. In the present case, it would seem likely—although not a foregone conclusion—that the Legislature *could* impose remedies for violations of the Vienna Convention that are in addition to remedies contemplated by the treaty itself without violating the Supremacy Clause. But, when faced with statutory ambiguity, we should not assume that the Legislature intended a certain remedy to extend to violations of an international treaty when it is not at all clear that the treaty contemplates such a remedy. At the very least, we have found reason to exclude the Vienna Convention treaty from

Article 38.23's reach, even if one rejected the idea of holding the statute inapplicable to treaties in general. However, the Vienna Convention Treaty illustrates well the proposition that Article 38.23 is not a suitable enforcement mechanism for international treaties. Given the language of Article 38.23, the purpose and function that treaties provide, and the uniquely federal aspect involved in enforcing international agreements, we hold that treaties do not constitute "laws" for Article 38.23 purposes. Point of error five is overruled.

### IV. Jury Charge

 In point of error six, appellant contends that the trial court erred in denying a requested instruction on voluntariness. At trial, appellant requested the following instruction, which the trial court denied:

> You're instructed under the law, a confession or admission of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible in evidence if it appears the same was freely and voluntarily made, without compulsion or persuasion.
>
> Now, if you find from the evidence or you have a reasonable doubt at the time of the statement of the defendant such statement there was to Officer Avila, the defendant was ill, was under medication or otherwise reduced to a condition, physical and mental impairment such as to render such admission, if any, not wholly voluntary, then you will completely disregard such admission as evidence for any purpose.
>
> Nor will you consider for any purpose any evidence obtained by the police as a result thereof.

Appellant contends that he was legally entitled to the instruction.

---

18. If the Supreme Court declines to address the issue in the near future, we may be called upon to decide, without Supreme Court guidance, whether a federal exclusionary rule applies to Vienna Convention violations, but that is not an issue before us today.

We observe that the jury charge that was given contained an equivalent statement of the first paragraph requested by appellant:

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion.

The issue, then, is whether the trial court erred in denying the second two paragraphs requested by appellant.[19]

Appellant concedes that the trial court's instruction tracks the language of Article 38.21, but contends that his additional instruction is required by law. But appellant fails to explain why the law requires his requested instruction. He devotes large portions of his brief to a discussion of preservation of error, harm, and a response to an anticipated argument about his requested instruction being a comment on the weight of the evidence. On the merits of the issue, however, appellant merely quotes Article 38.23(a) and asserts:

Appellant's requested jury instruction did nothing more than provide jurors with a generic statement of the law regarding the requirements for the admissibility of a defendant's statement. The State's likely rejoinder that the charge as given adequately protected appellant's rights will be incorrect, as nowhere in the charge as given, is the jury admonished that before it can consider appellant's statement it first had to find that it was wholly voluntary.

Appellant cites no legal authority for his assertion that his instruction is required by law. Nor does he explain why a statement is obtained in violation of the law if it is "not wholly voluntary" due to an illness or medication. Nor does appellant cite any authority for the proposition that a jury must be instructed that statements must be *"wholly* voluntary" to be admissible (emphasis added). An argument that fails to cite supporting authority presents nothing for review. *McFarland v. State,* 928 S.W.2d 482, 512 (Tex.Crim.App.1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997); Tex.R.App. P. 38.1(h).

Moreover, appellant does not explain what evidence raises the issue his instruction is designed to address, and he makes no citations to where such evidence appears in the record. Before a requested instruction on the voluntariness of a confession is required, some evidence must be presented to the jury that raises the issue. *State v. Terrazas,* 1999 WL 722548, *7 (Tex.Crim.App.1999); *Butler v. State,* 872 S.W.2d 227, 236 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1157, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995). When the defendant fails to discuss the evidence supporting his claim, he presents nothing for review. *Burks v. State,* 876 S.W.2d 877, 910 (Tex. Crim.App.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); Rule 38.1(h).

Further, despite appellant's protestations, his requested instruction did constitute an impermissible comment on the weight of the evidence. His instruction focused on illness and medication as factors that may render his confession involuntary. "Even a seemingly neutral instruction about a particular type of evidence constitutes an impermissible comment on the weight of the evidence in violation of Article 36.14 because such an instruction singles out a particular piece of evidence for special attention." *Matamoros v. State,* 901 S.W.2d 470 (Tex.Crim. App.1995).[20] An instruction that focuses on a particular factor that may render a statement involuntary is an impermissible comment on the weight of the evidence. *Penry v. State,* 903 S.W.2d 715, 748 (Tex.

---

19. We note that the jury charge also instructed the jury concerning the requisites for admissibility of a confession under Article 38.22 § 3.

20. Article 36.14 states, in relevant part, that a proper jury charge is one "not expressing any opinion as to the weight of the evidence."

Crim.App.1995), *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995)(special instruction singling out the issue of mental retardation in determining the voluntariness of a confession). Point of error six is overruled.

## V. Argument

■■■ In point of error seven, appellant contends that the trial court erred in overruling his objection to the following punishment phase argument made by the State:

> Today. Today is your day. You have an opportunity that you're never going to have again. You sit here today on a death qualified jury. Your days of criminal jury service are noted. I would suggest to you your verdict today is going to make a statement. Because like it or not, you're going to determine the value of human life. And that's what your message will be. You have a choice, I'll suggest to you. Based upon everything you know about this man, someone today with this decision is going to get the death penalty. Your decision. Is it going to be the defendant? Or is it going to be his next unsuspecting victim?

Appellant objected that the argument was inflammatory and prejudicial. The trial court overruled his objection. Appellant claims that the trial court erred. We disagree.

We have recognized four areas of permissible jury argument: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) responses to the defendant's argument; and (4) pleas for law enforcement. *Lagrone v. State,* 942 S.W.2d 602, 619 (Tex.Crim.App.1997), *cert. denied,* 522 U.S. 917, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). We have previously addressed two arguments similar to the one made in the present case. In *Sterling v. State,* 830 S.W.2d 114 (Tex.Crim.App. 1992), the prosecutor argued: "... if you don't answer those questions the way this evidence showed you they had to be an-

swered, both of them 'yes,' you're going to participate with Gary Sterling in taking another life." *Id.* at 119. We held that the argument, insofar as it alleged that the defendant would commit another murder in the future, constituted a reasonable deduction from the evidence. *Id.* at 120–121. In *Norris v. State,* 902 S.W.2d 428 (Tex. Crim.App.), *cert. denied,* 516 U.S. 890, 116 S.Ct. 237, 133 L.Ed.2d 165 (1995), the prosecutor argued:

> You know, I don't want to offend you when I say this; I just ask you to consider it. And it's not an accusation. But with the knowledge you've got now in your hands as jurors from all the way back to 1979 all the way up to 1987—the tracks of violence, the threats, the gunfire, the blood—if you don't do something about this and he kills again, aren't you just a little bit responsible? Think about it. Now you've got your chance to stop it and to do something. You've got the evidence. You've got the law. He's had a fair trial. You know about prior rehabilitation attempts. If you don't stop him and he does it again, you had the chance to stop him. What are you going to do then? You will have had some responsibility, possibly. I'm not going to say blood on your hands. But it will be more difficult to wash them.

*Id.* at 444. We held that the prosecutor's statements were proper pleas for law enforcement.

*Sterling* and *Norris* involve essentially the same type of argument, containing two components: (1) an allegation that the defendant will commit another murder if he is not executed, and (2) the prosecutor's placement of moral responsibility upon the jury for that second murder if a verdict of death is not delivered. Component (1) of the argument is a deduction from the evidence while component (2) is a plea for law enforcement. The argument in *Norris* possesses another characteristic: the use of colorful speech to make an emotional impact on the jury.

The argument here is similar to those made in *Sterling* and *Norris*. The prosecutor used colorful speech to convey the idea that the defendant would kill again and that the jury had a responsibility to prevent that occurrence through its verdict. On the record before us, the argument that appellant would kill again appears to be a reasonable deduction from the evidence.[21] We find that the prosecutor's argument was a reasonable deduction from the evidence and a legitimate plea for law enforcement. Point of error seven is overruled.

 In point of error eight, appellant complains about the following colloquy in the State's punishment phase argument:

MR. OWMBY [prosecutor]: You cannot say this in every case like this, but based on the evidence in this case, if he is sentenced to life in prison, he will hurt someone in prison. He will. And I'll explain to you why. Look at the way he does what he does. First, he associates with people. Lots of people. He forms a gang. Every time he sets out to do something. If you will recall, it's not just the two of them. Even in the killing of the security guard, there were other people in the car. There were four people in that car. There were five people in the bank robbery. Three to four people at the Luviano house. And there is no evidence who was driving the car over to Cruz Saucedo's house. But based on the way he does crimes, I suggest to you that there was at least one other person at Cruz Saucedo's apartment. He associates with people in a gang.

MR. VILLARREAL [defense counsel]: Object. There is no evidence that he is a member of any gang, Your Honor. That's improper. Argument outside the record.

THE COURT: Objection overruled.

MR. OWMBY: Gang is a common word. And it means a loose association. It sometimes means a loose association formed to commit criminal acts. That's what he formed every time he left to do these crimes. And that's what he will do in prison. He acquired weapons and tools to do what he wanted done. He stole guns. He stole guns from the Luvianos. He stole guns from Rafael— a gun from Rafael Fuentes. You remember the talk about the pistol that Cruz Saucedo was going to get. He stole a gun and a pager from Cruz Saucedo. And he was armed, wherever these weapons came from, when he robbed that bank. In prison he will find a way to arm himself and associate with gangs.

MR. VILLARREAL: Going to object, Your Honor. It's asking the Jury to speculate upon argument. And outside the record.

THE COURT: Objection overruled.

Appellant contends that the prosecutor argued matters outside the record. He contends that absolutely no evidence was presented that appellant was a member of a gang. The prosecutor's argument, however, was not referring to formal membership in a gang. The prosecutor clearly explained what he meant by "gang"—that appellant formed a loose association with others to commit crimes. Perhaps appellant is contending that the prosecution used its definition of "gang" to persuade the jury to draw an inference that appellant would become a formal member of a prison gang. Even if that were the prosecutor's intent, such an inference is a reasonable deduction from the evidence. That appellant consistently committed crimes in groups is some evidence from

---

21. In addition to the circumstances of the offense, the evidence at trial included evidence that appellant participated in the killing of another person (Cruz Saucedo) in that person's home, that appellant invaded another home (Luviano household) and held the occupants hostage, and that he robbed a bank and, during flight, hid behind the corner of a building with his gun in firing position waiting to ambush a police officer chasing him (appellant was spotted in this position by officers in a police helicopter).

which the jury could infer that appellant would affiliate himself with a gang in prison. The prosecutor's reference to appellant's activities as being part of a "gang" was a correct use of the word, and the use of that word to draw a connection in the jury's mind between appellant's informal association and formal gang activities was a legitimate rhetorical device designed to convey the logical connection between the two. Point of error eight is overruled.

The judgment of the trial court is affirmed.

HOLLAND, J., filed a concurring opinion in which MEYERS, PRICE and JOHNSON, JJ., joined.

JOHNSON, J., filed a concurring opinion.

HOLLAND, J., delivered a concurring opinion in which MEYERS, J., PRICE, J., and JOHNSON, J., joined.

I join the majority's opinion on all points of error except point of error five. With respect to point of error five, I would hold that Article 38.23 of the Texas Code of Criminal Procedure is a permissible enforcement mechanism for violations of Article 36 of the Vienna Convention on Consular Relations. Under the facts of this particular case, however, I would conclude that appellant failed to demonstrate a causal connection between the Vienna Convention violation and the oral statements taken by the officers.

In point of error five, appellant claims that the trial court should have suppressed his oral statements under Article 38.23 because he was not given proper warnings as required by Article 36 of the Vienna Convention. Appellant specifically asserts that he was not notified of his right to contact the Mexican Consulate before making a statement to the police. At the hearing on the motion to suppress, he presented evidence that, had a consul talked

to him, the consul would have advised appellant to refuse to talk to the police until an attorney was arranged for him.

The majority concludes that Article 38.23 is not the proper enforcement mechanism for treaties. In support of this conclusion, the majority states that because " 'laws' is placed in a series with 'Constitution' " in Article 38.23, while "laws" is placed in a series with "Constitution" and "treaties" in the Supremacy Clause of the United States Constitution, we should infer that the Texas Legislature, by omission, did not mean to include treaties within the scope of Article 38.23. This interpretation means that a "treaty" should not be considered a "law" for purposes of Article 38.23. I disagree with this interpretation. I would instead conclude that Article 38.23 is a permissible enforcement mechanism for violations of the Vienna Convention.[1]

The pertinent section of Article 36 of the Vienna Convention states,

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

\* \* \*

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Vienna Convention on Consular Relations, April 24, 1963, art. 36(1)(b), 21 U.S.T. 77,

---

1. In its Reply Brief, the State concedes that a treaty is a "law" within the scope of Article 38.23. It states that "[a] treaty is a law of the United States to be given the same force and effect as any other law. *Hanson v. Town of Flower Mound,* 679 F.2d 497 (5 th Cir.1982)."

100–101, 595 U.N.T.S. 261, 292 (ratified by the United States on Nov. 24, 1969). This Court has recognized that this section of the Vienna Convention "grants a foreign national who has been arrested, imprisoned or taken into custody a right to contact his consulate and requires the arresting government authorities to inform the individual of this right 'without delay.'" *Maldonado v. State*, 998 S.W.2d 239, 246–47 (Tex.Crim.App.1999). But we have never expressly held whether Article 38.23's exclusionary rule applies to treaties. I understand Article 38.23 to include treaties within the phrase "laws of the United States of America."

The statute's use of the word "laws" is, on its face, ambiguous. Even the Supremacy Clause uses the term "law" in two different contexts. The Supremacy Clause of the United States Constitution states that "[t]his Constitution, and the *Laws* of the United States . . .; and all Treaties made, or which shall be made, . . . shall be the supreme *Law* of the Land. . . ." United States Constitution, Article VI, Clause 2 (emphasis added). "Law" in one context means statutes or rules enacted by Congress. In the other context, "law" incorporates treaties. The majority cannot know which meaning of "law" the Texas Legislature intended to incorporate into Article 38.23. Thus, there are two different interpretations of "law," and the statute is ambiguous.

Considering that there are two generally acceptable interpretations of what the term "laws" incorporates, it is helpful to look at how other courts have interpreted what a treaty is. In *Edye v. Robertson*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), the United States Supreme Court discussed the role treaties hold in our system of laws.

> [A] treaty may also contain provisions which confer certain rights upon the citizens of or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. . . . The constitution of the United States places such provisions as these in the same category as other laws of congress by its declarations that 'this constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' *A treaty, then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.*

*Id.* at 598–99, 5 S.Ct. 247 (emphasis added).[2] The Supreme Court has also expressly held that treaties are "to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legisla-

2. The Supreme Court expressly differentiates between a treaty granting rights to citizens from a treaty that does not do so. *See Edye v. Robertson*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 28 L.Ed. 798 (1884). In the former, rights of individuals are to be enforced in courts just as they would be under a statute. *See id.* at 599, 5 S.Ct. 247. In the latter, enforcement is reliant on the "interest and the honor of the governments which are parties to it," and judicial courts cannot give redress. *Id.* at 598, 5 S.Ct. 247.

The majority argues that "[i]f a contract between sovereigns is broken, the party ordinarily expected to seek redress is the sover-eign, not an individual subject." *Ante.*, slip op. at 23 (citing *United States v. Li*, 206 F.3d 56, at 60–62 (1st Cir., en banc, 2000) (quoting *Edye*, 112 U.S. at 598, 5 S.Ct. 247.)). Both the majority and the First Federal Circuit Court of Appeals seemingly overlook the rest of the Supreme Court's holding in *Edye*, which is set out above. They do not acknowledge the fact that some treaties confer individual rights on citizens and those particular treaties are enforceable in "courts of justice." Considering that Article 36 of the Vienna Convention confers personal rights on foreign nationals, *see* infra pp. 5–7, the majority's and the First Circuit's arguments necessarily fail.

tive provision." *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 10, 57 S.Ct. 100, 81 L.Ed. 5 (1936). Therefore, according to the Supreme Court, a treaty is to be treated as a statute in our courts if that treaty determines rights of private citizens. More critical to the disposition of the instant case, given that we are interpreting a Texas statute, is that Texas courts have also recognized treaties are equal to statutes. In *Quintero v. State,* 761 S.W.2d 438, 440 (Tex.App.—El Paso 1988, *pet. ref'd* ), *cert. denied,* 493 U.S. 826, 110 S.Ct. 90, 107 L.Ed.2d 55 (1989), the El Paso Court of Appeals acknowledged that, according to the Supreme Court, "extradition treaties are *equivalent* to statutes." *Id.* (emphasis added) (citing *Valentine,* 299 U.S. at 10, 57 S.Ct. 100).[3]

Further support for the proposition that a treaty is the equivalent of a law can be found in the Restatement (Third) of Foreign Relations Law. "Treaties made under the authority of the United States, like the Constitution itself and the laws of the United States, are expressly declared to be 'supreme Law of the Land' by Article VI of the Constitution.... As law of the United States, international law is also the law of every State, is a basis for the exercise of judicial authority by State courts, and is cognizable in cases in State courts, in the same way as other United States law." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 111 cmt. d (1986). This Court recognized this principle in *Maldonado* when we stated, "Under the Supremacy Clause of the United States Constitution, states must adhere to United States treaties and give them the same force and effect as any other federal law. Thus, a violation of this treaty would arguably fall under the language in Article 38.23(a) if the issue is raised by the evidence." *Maldonado,* 998 S.W.2d at 247 (citations omitted).

Article 36 of the Vienna Convention confers a personal right on private citizens of this State. The Supreme Court has not yet directly addressed this issue, but it did discuss application of the Vienna Convention in *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). The Supreme Court found that the defendant in that case was procedurally barred from raising the Vienna Convention claim because he had failed to first raise the claim in a state court. *See id.* at 373, 118 S.Ct. 1352. The Supreme Court stated that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest." *Id.* at 374, 118 S.Ct. 1352. While not directly answering the question of individual rights, the Supreme Court did conclude that it was improper for a foreign country to bring suit under the Vienna Convention, thereby inferring that Article 36 of the Vienna Convention confers personal rights, as opposed to sovereign rights. *See id.* at 375, 118 S.Ct. 1352.

This Court and the Third Court of Appeals have defined consular assistance as a personal right. In *Maldonado,* we recognized that a foreign national has a right to consult his consulate, and the arresting officers must inform that national of this right without delay. *Maldonado,* 998 S.W.2d at 246. Using similar language, the Third Court of Appeals also labeled the Vienna Convention's instruction a "right." *See Cardona v. State,* 973 S.W.2d 412, 417 (Tex.App.—Austin 1998). Additionally, by looking at the plain language of Article 36(b) of the Vienna Convention, it is clear that the provision was meant to be a personal right for foreign nationals. The treaty states that "[t]he said authorities shall inform the person concerned without delay of *his rights* under this subparagraph." Vienna Convention on Consular Relations, art. 36(1)(b) (emphasis

---

**3.** If, as the majority asserts, a treaty is not a "law" for purposes of Article 38.23, it is difficult, if not impossible, to reconcile that holding with case law from the Supreme Court

expressly concluding that a treaty is the equivalent of a statute. A treaty cannot be the equivalent of a statute, yet not a "law" under the scope of Article 38.23.

added).[4] Likewise, it is apparent from the delegates' debate on Article 36 of the Vienna Convention that the provision concerned the individual rights of a detained foreign national. *See generally* 1 United Nations Conference on Consular Relations: Official Records, U.N. Doc. A/Conf. 25, U.N. Sales. No. 63.X.2 (1963); *United States v. Li*, 206 F.3d at 73–74 (1st Cir. 2000) (Torruella, C.J., concurring in part and dissenting in part) (quoting delegates from several countries who specifically refer to the "separate individual rights of nationals"). Finally, international courts have determined that Article 36 of the Vienna Convention "endows a detained foreign national with individual rights that are the counterpart to the host State's correlative duties." Op. Inter–Am. Ct. H.R., OC–16/99, 84 (Oct. 1, 1999); see also Case Concerning the Vienna Convention on Consular Relations (Paraguay v. U.S.), 1998 I.C.J. 248 (referring to a Paraguayan national's "rights" under the provisions of Article 36 of the Vienna Convention).

Since Article 36 of the Vienna Convention confers personal rights on foreign nationals, the treaty is to be considered a "law," equal to a statute and enforceable in courts of this State. There are compelling policy reasons for reaching this conclusion. Secretary of the State Madeline Albright explained in a speech at Howard University,

> [W]e are a part of an international system in which it is important to respect the various rules and conventions and laws that have been created to make the system work. . . . And among those rules . . . there are ways that foreign nationals are treated in another country, how diplomats are treated, how we deal with issues when they have committed a crime. . . .

So there are rules, and the reason there are rules, and we have been the creator of many of them, is because we benefit from them. As I said, there are a lot of Americans who travel abroad who sometimes get into trouble and who need to have the availability of our consular officers to be able to visit them if they have them jailed unjustly, or even if they've been jailed justly, or if they find themselves in some kind of a difficult situation that they, in other words, are able to call home.

Secretary of State Madeline K. Albright, *Remarks and Q & A at Howard University*, April 14, 1998, Washington, D.C. (released by the Office of the Spokesman, U.S. Department of State). If the United States does not provide a mechanism for enforcing the Vienna Convention, why should other signatories enforce the provisions of the treaty? The treaty is an important protection to Texans traveling in other nations. This State should extend the same protections to foreign nationals in Texas that we expect to be extended to our citizens when they are abroad.

In the past, the United States Department of State has been involved in individual cases where the Vienna Convention has not been scrupulously followed in this country. As an example, Virginia capital defendant Angel Breard was not informed of his right to contact his consulate from Paraguay. He was subsequently sentenced to death for the rape and capital murder of Ruth Dickie. *See Breard*, 523 U.S. at 372, 118 S.Ct. 1352. The State Department and the Department of Justice worked together to determine whether Breard had a fair trial, free of prejudice. While noting the Supreme Court and Governor of Virginia were not required to stay the execution, the two groups jointly wrote

4. While the preamble of the Vienna Convention states that "the purpose of such privileges and immunities [delineated by the Vienna Convention] is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States," it is disingenuous to use

this language as evidence that the treaty does not convey individual rights. The more specific language of Article 36 of the Vienna Convention expressly refers to a foreign national's "rights under [the] sub-paragraph." Vienna Convention on Consular Relations, art. 36(1)(b).

the Governor, requesting that he stay the execution. Breard was nevertheless executed. *See* James P. Rubin, *Daily Press Briefing # 46*, page 1–2, April 15, 1998 (released by the U.S. Department of State).

In a daily press briefing, the State Department commented,

Secretary Madeline Albright wrote to [the Governor of Virginia] asking that the Governor stay the execution of Mr. Breard for murder. The Governor decided to allow the execution to take place as scheduled last night. In our federal system, that was his decision. There is no doubt in our minds that Mr. Breard was guilty of the crimes for which he was sentenced; however, he was not told that Paraguay's consulate could be notified of his arrest by the Vienna Convention. That concerned the Department of State and his case was given careful attention here.

\* \* \*

This case does show, however, how important it is for federal, state and local law enforcement officials in the United States to be aware of the U.S. obligation to notify foreign nationals of their right to consular access. This is of great importance to foreigners here and it is of particular concern to the Secretary for Americans overseas.

We should, in the United States, see to it that foreigners here receive that same treatment that we expect and demand for Americans overseas. That is why the State Department will continue to work with governors and mayors and law enforcement officials across this country to insure that consular notification obligations are understood and honored. In that regard, Secretary Albright has sent to all the 50 states a copy of this document, "Consular Notification and Access," which is a lengthy booklet, explaining what the requirements are because, in many cases, this doesn't happen.

*See id.* The booklet referred to by James Rubin in the preceding passage states that "[t]he instructions in this booklet should be followed by all federal, state, and local government officials, whether law enforcement, judicial, or other,...." *Consular Notification and Access,* Part Two: Detailed Instructions on the Treatment of Foreign Nationals (visited January 11, 2000) <http://state.gov/www/global/legal_affairs/consularnotification/part2.html>. The booklet also states that the Vienna Convention is "binding on federal, state and local government officials to the extent that they pertain to matters within such officials' competence." *See id.* Under the terms of the Vienna Convention, *"the foreign national must be told of the right of consular notification and access"* in all cases. *See id.* (emphasis in original). Furthermore, the United States Department of Justice requires that "[i]n every case in which a foreign national is arrested, the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given." 28 C.F.R. § 50.5(1).[5]

---

5. In contrast to the compelling comments made by Secretary of State Madeline Albright and the policies implemented by the State Department and the Department of Justice, the State Department takes a markedly different stance when faced with adversarial litigation. In the Inter–American Court of Human Rights, *as a party to the suit,* the State Department argued that "there is nothing to suggest that failure to give consular notification invalidates the convictions of a state criminal justice system." Op. Inter–Am. Ct. H.R., OC–16/99, 26 (Oct. 1, 1999). But according to the Supreme Court, this "position" taken by the State Department is unworthy of deference. The Supreme Court has stated that courts should "declin[e] to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

During recent litigation, the State Department discussed the Vienna Convention in a letter written solely in conjunction with litigation pending in the First Federal Circuit

The Vienna Convention itself clearly states that it is to be enforced in accordance with the laws of Texas and of the United States. Paragraph 2 of Article 36 of the Vienna Convention states,

> 2. The rights referred to in paragraph 1 of this Article *shall be exercised in conformity with the laws and regulations of the receiving State,* subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under the Article are intended.

Vienna Convention on Consular Relations, art. 36(2) (emphasis added). Indeed, the Supreme Court relied in part on this provision in reaching its decision in *Breard v. Greene.* See *Breard,* 523 U.S. at 373, 118 S.Ct. 1352. Therefore, the manner in which the Vienna Convention is enforced in other countries is largely irrelevant in this State, as the United States and Texas are called upon to apply the treaty in conformity with *our own laws.* "A foreign national arrested and prosecuted in the United States is entitled to the protections of our Constitution and the procedures of our criminal justice system. A foreign national whose right to counsel or against self-incrimination is violated in this country is entitled to suppression of evidence even if such a violation has no remedy in another country." See *Lombera–Camorlinga,* at 888–89 (Boochever, J., dissenting).[6]

More importantly to the instant case, however, a foreign national arrested and prosecuted in Texas is entitled to the pro-

Court of Appeals. *See United States v. Li,* 206 F.3d 56, at 63–64 (1st Cir.; en banc, 2000). In this letter, the State Department offered the "position that suppression of evidence is an inappropriate remedy for a violation of this provision of the Vienna Convention." *United States v. Lombera–Camorlinga,* 206 F.3d 882, at 887–88 (9 th Cir., en banc, 2000). In *Lombera–Camorlinga,* the State Department's "position" was granted only minimal deference by the Ninth Circuit. *See Lombera–Camorlinga,* at 887–88 (stating that "it is true that courts tend to give less weight to an executive branch position adopted in the course of litigation, as is the case here, than to an interpretation made in diplomatic relations with other countries."). Moreover, the dissent in *Lombera–Camorlinga* placed this State Department letter in the correct light by noting that "[t]he majority goes beyond the treaty language to rely heavily on a letter from the State Department.... As the majority acknowledges, however, that letter is entitled to little deference, as it was prepared in the course of litigation. We should defer even less to the post-hoc rationalization of an agency charged with enforcement of a treaty provision when its enforcement has been so notably lax." *Id.* at 890 (Boochever, J., dissenting).

The dissent in *Lombera–Camorlinga* further explained that

> [a]dministrative agency constructions of governing statutes, or in this case a treaty, performed outside the adversary system are worthy of deference. However, agency positions developed in response to a lawsuit are not of the same character: they are specifically tailored to help obtain a favorable outcome in a pending controversy in which the agency is involved. Although we must certainly consider the persuasive force of the agency's argument, it is just that. The arguments advanced by an agency in litigation ought to rise or fall on their own weight.

*Id.* at 895–96 (Thomas, J., dissenting). It is in this light that this Court should consider the State Department's "position." In previous suits and in the letter cited in *Lombera–Camorlinga* and *Li,* the State Department apparently did advocate that suppression of evidence is an inappropriate remedy for violations of the Vienna Convention. But in arguing the importance of this "position," the majority fails to acknowledge that the State Department, as an executive agency of the United States government, was a party to the litigation in the cases cited by the majority. Considering the State Department's "position" has consistently been asserted in the course of adversarial litigation, this Court should give primary consideration to both the important policy reasons for enforcing the Vienna Convention in Texas, as articulated by Secretary of State Madeline Albright, and the actual language contained in the Vienna Convention treaty.

**6.** See both the majority and two dissenting opinions in *Lombera–Camorlinga* for a discussion on whether the federal exclusionary rule should apply to Vienna Convention violations. 206 F.3d 882 (9th Cir., en banc, 2000). Application of the federal exclusionary rule is not a question before this Court today.

tections and procedures of our state criminal justice system. In Texas, our exclusionary rule is articulated in Article 38.23, and it is this statute that the Court is called upon to interpret today. *See* TEX. CODE CRIM. PROC. Art. 38.23. In Texas, our statutory exclusionary rule is unique. Regardless of what the federal circuit courts say concerning application of the federal exclusionary rule, this Court is bound in this case to determine whether a treaty is a "law" for purposes of *our Texas statute—Article 38.23*. Based on the plain language of the Supremacy Clause, the Supreme Court's definition and characterization of "treaty," the portrayal of the character of treaties in other sources, strong policy considerations, and the plain language of Article 36 of the Vienna Convention, I would conclude that a treaty is a "law" and included within the scope of Article 38.23.[7]

Even when the terms of the Vienna Convention are violated, the Supreme Court has stated that it is "extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Breard,* 523 U.S. at 375, 118 S.Ct. 1352. In other words, the evidence should establish a causal connection between a violation of the Vienna Convention and the evidence at issue in the suppression hearing. The evidence must be shown to have been ob-tained by the authorities as a result of the violation of one's rights under the Vienna Convention. *See* TEX. CODE CRIM. PROC. Art 38.23.[8]

Because this is an issue of first impression, we look for guidance in another area of Texas jurisprudence which has the similar requirement of a causal relationship for exclusion of a confession. This Court requires such a relationship when examining violations of Article 15.17 of the Texas Code of Criminal Procedure. *See Cantu v. State,* 842 S.W.2d 667, 680 (Tex.Crim.App. 1992); *Ex parte Stansbery,* 702 S.W.2d 643, 647 (Tex.Crim.App.1986). Article 15.17 requires that "the person making the arrest shall without unnecessary delay take the person arrested or have him taken before some magistrate of the county where the accused was arrested." TEX. CODE CRIM. PROC. Art. 15.17(a). This Court has consistently held that violations of Art. 15.17 "[do] not automatically invalidate a confession" because the statute relates to the duties of the arresting officer and magistrate. *Williams v. State,* 692 S.W.2d 671, 675 (Tex.Crim.App.1984). "Absent a showing of a causal connection between an accused's confession and the failure to take the accused promptly before a magistrate, the validity of the confession is not affected." *Id.* at 675–76; *see also Cantu,* 842 S.W.2d at 680 (holding that the defendant failed to show a causal connection between the State's failure to take him before a

---

7. The majority's opinion suggests that under my interpretation of the Vienna Convention and Article 38.23, Texas would be the *"only* jurisdiction in the entire world that enforces the treaty through the use of an exclusionary rule sanction." *Ante.,* op. at 16. My research shows that at least one other jurisdiction has already enforced the Vienna Convention through exclusionary rule jurisprudence. *See State of Delaware v. Reyes,* 740 A.2d 7, 14 (Del.Super.1999) (granting the defendant's motion to suppress oral statements on the basis that he was denied his consular notification rights); *see also State of Ohio v. Ramirez,* 1999 WL 1313670, slip op. at *7 (Ohio Ct. App. 11 Dist., Dec.23, 1999) (unpublished opinion) (noting, in *dicta,* that "if the Vienna Convention had been complied with in this case, the errors detailed in appellant's first

point of error would have been avoided," and reiterating that "it is the imperative duty of the judicial tribunals of Ohio to take cognizance of the rights of persons arising under a treaty to the same extent as if they arose under a statute of the state itself.").

8. Article 38.23 (a) states,

> (a) No evidence *obtained by an officer* or other person *in violation of any provision* of the Constitution of law of the State of Texas, or of the Constitution of laws of the United States of America, shall be deemed admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. Art. 38.23(a) (emphasis added).

magistrate and the statements he gave to the police, and thus, the statements were properly admitted at trial); *Ex parte Stansbery*, 702 S.W.2d at 647 (concluding that because the record did not reflect a causal connection between the failure to take defendant before a magistrate and his confession, defendant's contention that his oral statement was inadmissible was overruled). Like Article 15.17, Article 36 of the Vienna Convention relates to procedures and duties of police officers following the arrest of a suspect—in this instance, a suspect who is a foreign national. A defendant's statements to police should not be suppressed when it has not been shown that there is a causal connection between those oral statements and the failure to be warned of rights under Article 36 of the Vienna Convention.

In conclusion, I would hold that to demonstrate a violation of Article 38.23, appellant must first show that he was deprived of a right under Article 36 of the Vienna Convention. Next, appellant must demonstrate that deprivation of the right resulted in officers obtaining the evidence at issue. Furthermore, if evidence is admitted in violation of Article 38.23, I would hold that a failure to exclude that evidence is harmful only if it affects "substantial rights" of the appellant. *See* Tex.Code Crim. Proc. art. 38.23(a); Tex.R.App. P. 44.2(b) (stating the standard for reversal due to non-constitutional errors).

In the instant case, the State admits that the terms of the Vienna Convention were violated. Appellant is a citizen of Mexico, the arresting officer knew that appellant was a Mexican citizen, and appellant was never informed of his right to talk to a Mexican consulate. But, while appellant demonstrates how the Mexican consulate would have helped him, he does not state that he would have availed himself of this help had he been informed of that right.[9] Therefore, appellant fails to show a causal connection between the officers' failure to inform him of his Vienna Convention rights and the oral statements he made. Appellant's statements were properly admitted at trial.[10]

In conclusion, I would hold that Article 38.23 is a permissible enforcement mechanism for alleged violations of Article 36 of the Vienna Convention on Consular Relations. In this case, however, appellant fails to show that the violation caused him to render oral statements excludable under Article 38.23. Because the majority finds Article 38.23 wholly inapplicable to the instant issue, I concur only in the result reached by the majority on point of error five.[11]

JOHNSON, J., filed a concurring opinion.

I join Judge Holland's concurring opinion as to point of error number five, and

9. The record does show that appellant was informed of his right to consult with an attorney, and he waived this right.

10. Finding the lack of a causal connection in this case in no way lessens the importance of the terms of Article 36 of the Vienna Convention. Violations of the Vienna Convention could result in the exclusion of evidence under Art. 38.23. We urge all law officials to comply with the terms of the Vienna Convention and give foreign nationals the proper consulate notification.

11. The majority's reliance on *Lombera–Camorlinga* and *Li* implies that the federal exclusionary rule would not apply to Vienna Convention violations. *See Ante.*, op. at 16–17. Later in the opinion, however, the majority

states that its holding "does not preclude the application of a federal exclusionary rule." *Id.* at 19. These two comments are contradictory. It is unclear to me exactly *how*, or even *if*, the Vienna Convention will be enforced in Texas under the conclusions of the majority opinion.

And while I do understand the wisdom in allowing the Supreme Court to "finally and definitely answer" the issues surrounding this treaty, this Court is simply called upon today to interpret the language of Article 38.23. An opinion issued by the Supreme Court concerning the application of the federal exclusionary rule to Vienna Convention violations has no bearing on the manner in which this Court interprets a state statute, namely Article 38.23.

otherwise concur in the judgment affirming the conviction. I write separately to emphasize why I believe that the exclusionary rule of TEX.CODE CRIM. PROC. art. 38.23 was not triggered in the instant case.

Art. 38.23 provides in relevant part that no evidence obtained by an officer or other person *in violation of* any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

(Emphasis added.) That is, under the plain language of the statute, the exclusion of evidence is mandated only when there is a causal connection between the legal or constitutional violation and the obtaining of the evidence.[1]

In the instant case, there was testimony at the suppression hearing that upon the two occasions on which appellant made statements to the police, he was given his statutorily required warnings, and that he indicated that he was waiving his rights and would make a statement. *See ante,* at 10 – 12. On this basis, there is no evidence that had appellant been told of his rights under the Vienna Convention, he would have acted any differently.[2] As such, it cannot be said that there is any causal connection between the statements appellant made to the police and the failure to apprize appellant of his rights under the Vienna Convention. Therefore, art. 38.23 neither requires that appellant's statements be suppressed, nor that the jury be instructed on that matter.

With these observations, I join Judge Holland's concurring opinion as to point of error number five, and otherwise concur in the judgment affirming the conviction.

---

1. *See, e.g., Lane v. State,* 951 S.W.2d 242 (Tex.App.—Austin 1997, no pet.) (trial court did not err in admitting results of breath test where defendant orally received warnings concerning breath test, but did not receive same warnings in writing, in violation of Transportation Code; there was no evidence that he did not understand warnings or that failure to receive information in writing had any impact on his decision to take breath test); *Jessup v. State,* 935 S.W.2d 508 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (trial court did not err in admitting testimony concerning defendant's refusal to take breath test where written warnings were given to defendant after his refusal; record showed that defendant was given both oral and written warnings and that he understood these warnings, defendant failed to establish any causal connection between his refusal and fact that he was not given written warnings before he refused breath test, and when he did sign written warnings, he reaffirmed his earlier decision); *Stockton v. State,* 756 S.W.2d 873, 874 (Tex.App.—Austin 1988, no pet.) (although police officer enrolled in high school in violation of Education Code, defendant did not indicate that her belief that police officer was high school student induced her to sell methamphetamine to the officer; therefore, nothing in record indicated that incriminating evidence was obtained as a result of alleged violation of Education Code).

2. At the hearing pursuant to the motion to suppress his statements, appellant disputed that he had voluntarily and intelligently waived his rights. The trial court ruled the evidence admissible. At this hearing, there was nothing proffered concerning appellant's rights under the Vienna Convention.