SAFSCAK V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-217-CR

BRIAN RICHARD SAFCSAK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396
TH
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Brian Richard Safcsak appeals from his conviction for the murder of Barbara Gilreath.  In six points, he complains that: t
he trial court erred by  receiving a vague and uncertain jury verdict that conflicted with jury instructions and the indictment; t
he trial court erred by not providing verdict forms for each charging instruction; the evidence was legally and factually insufficient to sustain the verdict and judgment of murder under the evidentiary rule of corpus delicti, the evidence was legally and factually insufficient to sustain the verdict and judgment of murder because the evidence regarding the cause of death is insufficient to support the allegations in the indictment; and the trial court erred by denying appellant’s motion for a directed verdict as to count one.  We affirm.

Facts

On June 17, 2000, witnesses saw appellant’s girlfriend, Barbara Gilreath putting boxes and a vacuum cleaner outside the duplex where she lived with appellant.  Sometime later, a neighbor heard fighting in appellant’s part of the duplex.  After it was quiet, the neighbor saw appellant outside bringing the boxes and vacuum back inside, however, no one saw Barbara at the duplex again.  Appellant contends that Barbara left in a dark car or truck, but witnesses testified that she  would not have left without her personal items and her dog.  Appellant gave Barbara’s dog and some of her personal items to a friend and pawned her other belongings at a pawn shop on June 18, 2000.

Barbara’s mummified remains were found across the highway from appellant’s duplex on or around July 25, 2000.  At trial, the State presented evidence that appellant had confessed to Barbara’s murder to his cell mate.  The medical examiner testified that he discovered multiple fractures all over the her skeleton, and evidence of blunt force trauma indicating that she had been beaten at or near the time of death.  The jury found appellant guilty of her murder and the trial court sentenced him to sixty years’ confinement.

Sufficiency of the Evidence

In his third, fourth, and fifth points, appellant contends that the evidence was legally and factually insufficient to support the verdict.  Specifically, appellant argues in his third point that the State failed to prove corpus delicti, or in other words, that the death of the victim was caused by the criminal act of appellant.  
In points four and five, appellant complains that the State failed to present sufficient evidence of the cause of death as alleged in the indictment.  

Corpus Delicti

An extrajudicial confession by the accused is insufficient to support conviction unless corroborated.  
Gribble v. State
, 
808 S.W.2d 65, 70 (Tex. Crim. App. 1990).  
Corpus delicti is a rule of evidentiary sufficiency that can be summarized as follows:  “an extrajudicial confession of wrongdoing, standing alone, is not enough to support a conviction;  there must exist other evidence showing that a crime has in fact been committed.”
  
Rocha v. State
,
 16 S.W.3d 1, 4 (Tex. Crim. App. 2000)
;
 
Williams v. State
, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997)
.  This other evidence alone need not be sufficient to prove the offense, “all that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence.”  
Williams, 
958 S.W.2d at 190
 
(quoting 
Chambers v. State
, 866 S.W.2d 9, 15-16 (Tex. Crim. App. 1993), 
cert. denied
, 511 U.S. 1100 (1994)).  The corpus delicti rule is satisfied if “some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred.”  
Salazar v. State
,
 86 S.W.3d 640, 645
 (Tex. Crim. App. 2002).  The identity of the perpetrator, however, is not a part of the corpus delicti and may be established by an extra-judicial confession alone.  
Gribble
, 
808 S.W.2d at 70.

Here, appellant argues that the State did not meet the requirements of corpus delicti 
because it failed to prove that the victim’s death was caused by the criminal act of appellant.  We disagree.  The State presented ample evidence to show that the victim’s death was caused by appellant’s criminal act.  

First, the State presented evidence of appellant’s extra-judicial confession to the murder of Barbara.  While in the Tarrant County Jail awaiting trial, appellant became friendly with his cell mate Christopher McAlister.  At trial, McAlister testified that appellant confessed to him and said, “he had already beat the charge [murder] once and that he wasn’t concerned about it, that he would beat it again.”  Also, one day
 appellant became emotional and looked as though he were about to cry.  McAlister asked him if something was bothering him and, appellant responded saying that the night of Barbara’s disappearance she and appellant had argued because she wanted to leave him. 
 Appellant told McAlister that he had gotten mad at her and started beating on her. 
 McAlister testified that appellant told him that “he beat the bitch until she died.”  Appellant further told McAlister that he took Barbara’s body across the highway and put it in a field.  
Appellant took off Barbara’s clothes so that the police would think that appellant’s neighbor, a convicted sex offender, had committed the murder.  McAlister related to the jury that appellant also confessed that he pawned some of Barbara’s belongings
 and gave others to a prostitute named Becky or Beverly. 

Second, the State also presented other evidence in addition to appellant’s confession to McAlister,
 which considered alone or in connection with the confession, showed that the crime actually occurred.
 
 See Salazar
,
 86 S.W.3d at 645.
  The police found the victim’s body in a field that was within walking distance of appellant’s home.  The victim was severely beaten and had suffered from multiple fractures to her skull, spine and ribs.  The fractures to her head and spine were consistent with her having been beaten with a bat or board.   
She also suffered fourteen rib fractures that were likely caused by crushing blows or kicks using a foot or knee. 

The State also called appellant’s neighbor, Floyd Bacon, who shared a duplex with appellant and Barbara, to testify.  He testified that 
at around 10:00 p.m. on June 17
, 2000, he 
came home and saw Barbara out on the porch of the duplex with personal and household items, including a vacuum.  While Bacon watched, appellant came out and began arguing with Barbara.  Bacon went back inside his part of the duplex and heard appellant and Barbara arguing and after a little while, Bacon heard a noise, a thud, like someone hitting or falling against the wall.  Concerned, Bacon went next door to appellant’s and knocked on the door.  When appellant answered he looked sweaty and was out of breath as though he had been in a struggle.  Bacon told appellant, “if you got to hit on her, you need to let her go.”  Appellant replied, “Well, she wouldn’t shut up, so I had to hit her.”  Appellant wouldn’t let Bacon into his side of the duplex, so Bacon went back to his side and didn’t hear anything more from appellant’s side after that.  Bacon stayed up until 2:30 or 3:00 a.m. the next morning and never heard a car or anyone leave the duplex, but he did see appellant go out onto the porch and bring Barbara’s things inside.  Bacon never saw or heard from Barbara again. 

Another of appellant’s neighbors from a nearby apartment complex, Diana Lewis, also testified for the State.  Lewis was a friend and co-worker of Barbara’s and saw her almost every day.  Lewis described Barbara as a small, thin woman who might have weighed 100 pounds.  She told the jury that Barbara had a little dog named Macho that she took everywhere with her.

The last day that Lewis saw Barbara was June 17, 2000.  Barbara came to Lewis’s house in the early evening to use the phone.  Barbara was visibly upset, like she had been crying.  Barbara told Lewis that she and appellant had argued and that she needed to call Lewis’s son so that he could pick her up.  Barbara spoke to Lewis’s son and agreed to meet him at the Radisson that night so that she could stay with him. 

Appellant came to the Lewis’s while Barbara was on the phone and began screaming at her and calling her names like “whore” and “bitch.”  Barbara and appellant left the Lewis’s, but Barbara never arrived at the Radisson to meet Lewis’s son.  As appellant was leaving, he told Lewis’s husband, David, that, “if there’s any f------ whore going to put me in jail, I’m going to kill them.”

That same evening
, Lewis noticed Barbara’s vacuum cleaner and other personal items out on the porch, but later that evening the items were gone.  Lewis went to bed around midnight and never heard any cars pull up to the duplex that night.  Barbara did not show up for work the next day.  When Lewis asked appellant where Barbara was, he told her that Barbara left on foot and took her dog with her.  Barbara never came to pick up her pay checks or personal property from work.

The State also presented evidence that appellant pawned some of Barbara’s belongings and gave others to a friend, while at the same time contending that Barbara had taken all her belongings with her when she left.  
Rebecca “Becky” Martinez testified that on June 18, 2000, she helped appellant pawn some of Barbara’s personal items.  Appellant gave Martinez Barbara’s vacuum cleaner, glassware, and a couple of comforters.  

After appellant and Martinez finished at the pawn shop, they went back to appellant’s place and appellant asked Martinez if she wanted “the little dog that [Barbara] had had, that she had left.”  Appellant took Martinez to a nearby construction site and retrieved the dog from the bottom of a barrel.  Appellant told Martinez that if anyone asked her about the dog, to say that she found it walking on the side of the road because the police had been asking about it.  Barbara’s son Randy testified that Barbara would never have left the dog behind or abandoned it and that she treated the dog like “one of her children.”  Barbara’s other son David testified that the first thing Barbara would have taken with her if she left would have been the dog because she loved it like a child.   After the police found Barbara’s body and identified it, Martinez turned over the pawn ticket for Barbara’s vacuum cleaner
, personal items, and the dog to the police.  Martinez also testified that “kind of late” the night of June 17, 2000, appellant came to her house.  
She testified that appellant said he had been walking all over downtown because Barbara had left him.  Martinez described him as being “kind of out of it,” upset, hot, sweaty, and wet the night he came to her door.  
When Martinez asked appellant why he was wet he told her that he washed himself off with a water hose. 

Appellant’s version of June 17, 2000 was not consistent.  Barbara regularly met her ex-husband at a bar to give him photographs of their children
 and grandchildren.  On June 17, 2000, appellant called the bar 
and told Donna Rains, a bartender, to tell Barbara’s ex-husband that Barbara left with someone in a truck and took all of her “stuff” with her.  Appellant told one police officer that Barbara left him after they had an argument about her dog.  Appellant told Officer Robert Viana that Barbara left in a vehicle, but he could not describe it.  Appellant said that Barbara took most all of her things except two big items.  Appellant told Sergeant J.C. Stockton that Barbara left in a 1978 or 1980 model General Motors Car, possibly a Cutlass.  In appellant’s written statement to police, he said that she took her dog and left in a 1978 or 1980 Cutlass or GM.  Appellant told Barbara’s son, Randy Warfield, that Barbara “grabbed a few things and left.”  On June19, 2000, appellant called Randy again and told him that Barbara “had left with someone in a car,” but later that same day appellant told Randy that she left “with someone in a pickup truck.”  When Diana Lewis asked appellant about Barbara, appellant told her that she left on foot and took her dog with her. 

After reviewing appellant’s confession and all of the other State’s evidence, we hold that the evidence was legally sufficient to support the jury’s finding that Barbara’s death was caused by appellant’s criminal acts under the corpus delicti rule.  We overrule appellant’s third point.

Cause of Death

In points four and five, appellant complains that the State failed to present sufficient evidence of the cause of death as alleged in the indictment. 
 Applying the appropriate standards, 
we review the evidence for legal and factual sufficiency regarding cause of death. 
 

The State medical examiner testified that Barbara’s remains were mummified and weighed less than fifteen pounds when the police found her on July 25, 2000.  The examiner used x-ray photographs to identify the victim as Barbara Gilreath.  Because her body had been exposed to the elements for over a month, it no longer contained soft tissue, fluids, or body organs that could be tested by the examiner, so he
 used the skeleton to determine how the Barabra died. 

During the examination of the body, the examiner found several fractures on the face in the right styloid process, right facial bones, the eye socket, and two fractures of the jaw bone.  
The examiner opined that the injuries were caused by blunt force injuries inflicted near or at the time of death.  The breast bone or sternum was fractured in two places and her ribs were broken in fourteen places.  The fractures of the sternum and ribs were consistent with crushing pressure applied from the front to the back like stomping on the victim’s chest with a foot or by a knee dropping onto the victim’s chest. 
 The broken ribs would have made it impossible for Barbara to breathe and she would have likely asphyxiated. 

Barbara also had three cervical spine fractures, three neck fractures, a fracture of the right styloid, and a fracture of the hard palate in the mouth.  These injuries were consistent with the type of force you get when hit in the head with a baseball bat or if kicked or stomped on the side of the head.  The examiner ruled that Barbara's death was a homicide, although he admitted on cross-examination that without soft tissue or organs he could not rule out that her death could have been caused by a stabbing, gunshot wound, drug overdose, or heart attack. 

Appellant contends that the State’s allegations that appellant caused Barbara’s death by striking her with an object, his fist, or foot
 are not supported by the evidence presented by the medical examiner.  A 
review of the medical evidence along with the testimony of the State’s witnesses, and appellant’s confession discussed infra reveals that more than sufficient evidence exists to support the allegations in the indictment.  Thus, applying the appropriate standards of review, we hold that the evidence is both legally
(footnote: 1) and factually
(footnote: 2) sufficient to support the trial court’s conviction.
(footnote: 3)  
We overrule appellant’s fourth and fifth points.

The Verdict and Multiple Manner and Means

In his first point, appellant complains that t
he trial court erred by receiving a vague and uncertain jury verdict that conflicted with jury instructions and the indictment.  Specifically, appellant complains that the jury’s general verdict finding appellant “guilty of the offense of murder, as charged in the indictment” was vague because the verdict did not specify the manner and means.  The indictment had one count with multiple paragraphs alleging murder by different manner and means and the jury instructions charged on three of the allegations, differing in the manner and means.  

In his second point, appellant complains that the trial court erred by failing to provide separate “guilty” and “not guilty” verdict forms for each of the three paragraphs describing the different alleged manner and means of the single count of murder.  The State responds, contending that the trial court did not err in submitting a multiple paragraph jury charge alleging multiple manners and means by which appellant caused Barbara's death, nor did it err in failing to provide separate verdict forms for each alleged manner and means because the trial court is entitled to submit a general verdict form to the jury.  

Alternate manner and means of committing a single offense may be charged in the same indictment.  
Kitchens v. State
, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).  When an indictment alleges differing methods of committing murder in the conjunctive, the jury may properly be charged in the disjunctive, allowing the jury to be split on which theory supports the verdict.  
Martinez v. State
, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004).  W
here alternate theories of committing the same offense are submitted to the jury in the disjunctive the jury is authorized to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.  
Zuniga
,  2004 WL 840786, at *9;
 
Rosales v. State
, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); 
Rabbani v. State
, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992) 
cert. denied,
 509 U.S. 926 (1993); 
Kitchens
, 823 S.W.2d at 258; 
Patterson v. State
, 46 S.W.3d 294, 306 (Tex. App.—Fort Worth 2001, no pet.).

Here, the State alleged in the first count of the indictment that appellant committed the offense of murder and alleged in the disjunctive four different manner and means of committing the offense.  
The State waived one of the four paragraphs of count one before voir dire.  
The theories in the three remaining paragraphs alleging different manner and means of the count of murder were prosecuted at trial.  Therefore, the trial court properly submitted the different manner and means in the disjunctive in the jury charge and provided for a general jury verdict.  
See Kitchens
, 823 S.W.2d at 258
; Price v. State
, 59 S.W.3d 297, 301 (Tex. App.—Fort Worth 2001, pet. ref’d).
  
Accordingly, we overrule appellant’s first and second points.

Unknown Weapon

In his sixth point, appellant complains that the trial court erred by denying appellant’s motion for a directed verdict as to count one.  Specifically, he contends the evidence is legally insufficient to support the verdict because the State did not prove that the grand jury used due diligence to determine the weapon used in the offense before concluding that the weapon or weapons were “unknown.”  Appellant argues that the issue of due diligence was raised by the medical examiner when he testified that Barabara's injuries were consistent with having been struck by a bat or board.  

When an indictment alleges that the manner and means used to commit an offense are unknown and the evidence presented at trial does not reveal what type of object was used, a prima facie showing exists that the object was unknown to the grand jury.  
Matson v. State
, 819 S.W.2d 839, 847 (Tex. Crim. App. 1991); 
Tidrow v. State
, 916 S.W.2d 623, 630 (Tex. App.—Fort Worth 1996, no pet.).  However, when the evidence shows what object was used then the State must prove the grand jury unsuccessfully used due diligence to learn the manner or means.  
Tidrow
, 916 S.W.2d at 630.

Here, the evidence presented at trial never revealed what type of object was used.  The medical examiner only testified that some of Barbara's injuries were “consistent” with having been struck by a baseball bat or board, but that it was “possible” that other objects may have been used.  The examiner also testified that the injuries appeared to be “blunt force injuries” that “may” have been caused by a foot or knee and that it was “unlikely” that they were caused by a hand or fist.  No other evidence of the type of weapon or weapons used were admitted at trial.  Because the evidence did not reveal what type of object was used in the offense, a prima facie showing existed that the object was unknown to the grand jury.  
See Matson
, 819 S.W.2d at 847; 
Tidrow
, 916 S.W.2d at 630. Accordingly, the State was not required to prove that the grand jury unsuccessfully used due diligence to learn the manner or means.  
See Tidrow
, 916 S.W.2d at 630.  We hold that the trial court did not err by denying appellant’s motion for a directed verdict on these grounds.  We overrule appellant’s sixth point.

Conclusion

Having overruled all of appellant’s points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL A: LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  July 15, 2004

FOOTNOTES
1:
See Emery v. State
, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994) (providing legal sufficiency standard of review), 
cert. denied
, 513 U.S. 1192 (1995); 
Narvaiz v. State
, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992) (same), 
cert. denied
, 507 U.S. 975 (1993).

2:
See
 
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003)
 (holding that 
a proper factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal);
 Santellan v. State
, 939 S.W.2d 155, 165 (Tex. Crim. App. 1997) (providing factual sufficiency standard of review); 
Clewis v. State
, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996) (same);
 see also Zuniga v. State
, No. 539-02, 2004 WL 840786, at *7 (Tex. Crim. App. Apr. 21, 2004)(considering in a factual sufficiency review all of the evidence in a neutral light, and asking whether a jury was rationally justified in finding guilt beyond a reasonable doubt)
.

3:
See Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Johnson v. State
, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); 
Clewis
, 922 S.W.2d at 134.