*1476-14*

ORIGINAL

PD-1476-14

IN THE

TEXAS COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 16 2015

Abel Acosta, Clerk

DELBERT ANDREWS MILLS,

PETITIONER,

VS.

THE STATE OF TEXAS,

RESPONDENT

FILED IN
COURT OF CRIMINAL APPEALS

JAN 23 2015

Abel Acosta, Clerk

Petition For Discretionary Review from the
Thirteenth Court of Appeals, Corpus Christi
number 13-13-00129-CR

PETITION FOR DISCRETIONARY REVIEW

Delbert A. Mills – Pro se
Clements Unit – 1837362
9601 Spur 59.1
Amarillo, TX 79107-9606

TABLE OF CONTENTS

                                                    PAGE

Table of contents............................................ i.

Index of Authorities........................................ ii.

Statement Regarding oral Argument........................... 1.

Statement of the Case....................................... 1.

Statement of procedural History............................. 1.

Grounds For Review.......................................... 1.

Argument.................................................... 2.

Prayer...................................................... 7.

Appendix

# INDEX OF AUTHORITIES

                                                                    PAGE

Alvardo v. State, 912 S.W.2d 199 (Tex.Crim.App.1995)... 4

Brooks v. State, 323 S.W. 3d 893 (Tex.Crim.App.2010)... 1, 5

Carrizales v. State, 414 S.W. 3d 737 (Tex.Crim.App.2013) 5

Cook v. State, 884 S.W. 2d 485 (Tex.Crim.App.1994)..... 1

Gribble v. State, 808 S.W.2d 65 (Tex.Crim.App.1990).... 2

In re winship, 397 U.S. 358 (1970)...................... 3

Jackson v. Virginia, 443 U.S. 307 (1979).............. 1, 3

Laster v. State, 275 S.W. 3d 512 (tex.Crim.App.2009)... 1

Rocha v. State, 16 S.W.3d 1 (Tex.Crim.App.2000)........ 2

Salazar v. State, 86 S.W. 3d 640 (Tex.Crim.App.2002)... 2

U.S. v. O'Brien, 130 S.Ct. 2169 (2010)................. 3

Vodochaodsky v. State, 158 S.W. 3d 502 (Tex.Crim.App2005)5

Williams v. State, 958 S.W. 2d 186(Tex.Crim.App.1997).. 2


Texas Penal Code § 19.02............................... 1

Texas Code of Criminal Procedure § 38.03............... 4

## A. STATEMENT REGARDING ORAL ARGUMENT

Petitioner is a pro se prisoner of whom is not trained in law or skill in oral argument. Further, the issues presented herein are not of a complex sort which requires the oral argument and Petitioner therefore waives oral argument in this case.

## B. STATEMENT OF THE CASE

This case results from the murder conviction for allegedly killing Petitioner's wife through arson nearly ten years after the fact based on an inconclusive determination of the fire.

## C. STATEMENT OF PROCEDURAL HISTORY

On January 17, 2013 from the 24th District Court of Goliad County, Texas in cause number 12-01-4634-CR, the Petitioner was found guilty of the offense of murder and sentenced to life in prison. Petitioner gave timely notice of appeal and on the 29th day of August, 2014, the Thirteenth Court of Appeals in Corpus Christi, Texas affirmed the conviction in cause number 13-13-00129-CR. Petitioner immediately filed his Motion For New Trial which was denied on October 16, 2014. Petitioner now seeks Discretionary Review.

## D. GROUNDS FOR REVIEW

CAN THE THRITEENTH COURT OF APPEALS AFFIRM A CONVICTION FOR MURDER ON INSUFFICIENCY OF EVIDENCE BY APPLYING THE CORPUS DELICTI RULE ON A NON CONFESSION CASE?

## E. ARGUMENT

GROUND FOR REVIEW RESTATED:

CAN THE THIRTEENTH COURT OF APPEALS AFFIRM A CONVICTION FOR MURDER ON INSUFFICIENCY OF EVIDENCE BY APPLYING THE CORPUS DELICTI RULE ON A NON CONFESSION CASE?

SUFFICINECY OF EVIDENCE STANDARD OF REVIEW:

In reviewing the sufficiency of evidence to support a conviction, the reviewing court must view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Brooks v. State, 323 S.W. 3d 893, 895 (Tex.Crim.App. 2010). The "Jackson standard" is the only standard for review as well established in Texas. This review "ensures that the fact finder reached a rational decision." Laster v. State, 275 S.W. 3d 512, 517 (Tex.Crim.App. 2009).

As alleged by indictment, the State must prove beyond any reasonable doubt that Petitioner: (1) intentionally and knowingly (2) caused the death of Patricia Mills (3) by intentionally and knowingly (4) causing a fire at her residence (5) that resulted in her death. Texas penal Code § 19.02; Cook v. State, 884 S.W. 2d 485, 491 (Tex.Crim.App. 1994).

The whole case is based soley upon circumstantial evidence of which the Thirteenth Court Appeals claims is sufficient to prove Petitioner guilty of murder. See Opinion @ p. 12.

Page 2.

CORPUS DELICTI:

The Appeals court gives review on the sufficiency of the evidence in this case based on the State's argument of a "corpus delicti" rule. This review and determination has abslutely no application to the case at bar and is error for the review to be based on such as Petitioner never gave any confession of the alleged murder!

An extra-judicial confession by the accused is insufficient to support a conviction unless corroborated by evidence to support the crime. Gribble v. State, 808 S.W. 2d 65, 70 (Tex.Crim.App.) The corpus delicti rule is a rule of evidentiary sufficiency that can be summarized as follows: "an extra-judicial confession of wrongdoing, standing alone, is not enough to support a conviction; there must exist other evidence showing that a crime has been committed." Rocha v. State, 16 S.W. 3d 1, 4 (Tex.Crim. App. 2000). This other evidence need not be sufficient by itself to prove the offense: "all that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence." Williams v. State, 958 S.W. 2d 186, 190 (Tex.Crim.App. 1997) the corpus delicti rule is satisfied if some evidence exists outside of the confession which, considered alone or in connection with the confesion, shows that the crime actually occurred. Salazar v. State, 86 S.W. 3d 640, 645 (Tex.Crim.App. 2002).

The first fact that needs to be established is that there was never any "extra-judicial confession" made by the Petitioner regarding any murder! Therefore, no "corpus delecti" rule is applicable to this case and to apply such rule is grave error and results in the conviction of an innocent person that must serve life in prison for a murder that never happened.

In looking at the proper review is "did the state prove every element of the crime?" Id. Jackson@ 319. Under the Due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, the State is required to prove beyond a reasonable doubt every element of the crime with which a defendant is charged. In re Winship, 397 U.S. 358, 364 (1970); U.S. v. O'Brien, 130 S.Ct. 2169, 2174 (2010). Therefore, the State must prove beyond any reasonable doubt that Petitioner "intentionally and knowingly caused a fire that caused the death of Patricia Mills."

At trial, Mr. Dean Shirley of the State Fire Marshal's Office testified that there was a "fire investigation" done at the scene of the accident and the conclusion of the fire investigation as to the cause of the fire was "undetermined." See Volume Two of the Reporter's Record (II R.R.) at 195. Two fire investigator experts established that the fire was "undetermined" and submitted expert reports to the fact. See Defendant's Exhibits 9 and 10.

Page 4.

The State offered as proof that Petitioner intentionally caused a fire that intentionally resulted in the death of patricia Mills was circumstantial evidence that a cigarette was used as fuse to cause a delayed ignition of a kerosene lamp that started the house fire. This unfounded theory by the State was proven during trial that such a means of starting a house fire was not posible. Former Texas A&M fire instructor and certified fire investigator Ricky Jones submitted a report that established that Fire Expert Dean Shirley had an engineering firm conduct a simulation of using a cigarette to start a kerosene fire from a lantern was not possible and therefore the theory of the State failed to prove an intentional act by the Petitioner as required by law! (II R.R. at 193-95.)

The State had to prove the fire was an intentional act as alleged by indictment and required for a murder conviction. "[N]o person may be convicted of a criminal offense and denied his liberty unless his criminal responsibility for the offense is proved beyond a reasonable doubt." Alvarado v. State, 912 S.W.2d 199, 206-07 (Tex.Crim.App. 1995). See also Article 38.03, Texas Code of Criminal Procedure. Unfortunately, Petitioner's wife died in a house fire. However, the fire that caused the death of Patricia Mills was not an intentional act as well established to the court during the trial. See Expert Reports 9 and 10 and testimony of Ricky Jones, Fire Marshall for the City of Denton, Texas II R.R. at 192-93.

Due to the fact that there was no extra-judicial confession the application of the "corpus delicti" rule is erronous. Further, the Appeals Court claims that "the State suggested that there were several scenarios whereby the spread of the fire could have been delayed." Opinion @ 14. The simple fact alone remains, "suggestion" does not constitute "proof beyond a reasonable doubt." Id. Jackson. Even the "suggestions" made by the State were proven to be unreliable by Fire Investigator Experts!

For the Thirteenth court of Appeals to apply the "corpus delicti" rule regarding a non-confession case and use the same as a means to affirm a murder conviction that is based on a proven false "suggestion" by the State is a total miscarriage of justice in a insufficiency of evidence review.

The State clearly failed to prove the "intentional" act required for murder and the conviction cannot stand based upon such insufficient evidence. No rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Vodochodsky v. State, 158 S.W. 3d 502, 509 (Tex.Crim.App. 2005) There was absolutely no proof at all that a criminal act was ever committed. Carrizales v. State, 414 S.W. 3d 737 9Tex.Crim.App. 2013). The elements of murder as alleged by indictment was never proven beyond a reasonable doubt and no rational fact finder could find sufficient evidence from the record to affirm the conviction based upon the Jackson standard of review. id. Brooks @ 913.

## F. PRAYER

Wherefore, Petitioner prays that:

(1). This Court will grant a Discretionary Review and after said review:

(2). Determine that the review of "corpus delicti" by the Thirteenth Court of Appeals was not applicable and in error;

(3). Give an en banc review of the evidence in this case based upon the proper standard of review and after the review;

(4). Reverse the Court of Appeals opinion with remand back to the trial court with instructions of entry of aquittal for insufficient evidence to prove murder by Petitioner; and

(5). Any all other relief to which Petitioner is justly entitled.

Respectfully submitted,

Delbert A. Mills
Clements unit - 1837361
9601 Spur 591
Amarillo, TX 79107-9606
Pro se

## CERTIFICATE OF SERVICE

This is to certify that I have on this _15_ day of December, 2014, served a true and exact copy of this brief on respondent by placing the same in the U.S. mail, postage paid, addressed to:

Michael Sheppart,
Criminal District Attorney
Goliad County, Texas
307 N. gonzales St.
Cuero, TX 77954

Delbert A. Mills

Page 7.

APPENDIX

MEMORANDUM OPINION - THIRTEENTH COURT OF APPEALS



NUMBER 13-13-00129-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DELBERT ANDREW MILLS,                                    Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

On appeal from the 24th District Court of
Goliad County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza and Benavides
### Memorandum Opinion by Justice Garza

Following a bench trial, the trial court found appellant, Delbert Andrew Mills, guilty of murder, a first-degree felony offense, *see* TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (West, Westlaw through 2013 3d C.S.), and sentenced him to life imprisonment. Specifically, the trial court found appellant murdered his wife, Patricia Mills, by intentionally and knowingly causing a fire at their residence, which resulted in her death.

By a single issue, appellant contends the evidence is insufficient to prove that he intentionally and knowingly caused the fire that killed Patricia. We affirm.

## I. BACKGROUND

Appellant's trial began on January 14, 2013. The fire that resulted in Patricia's death occurred almost ten years earlier, on June 25, 2003.

Mildred Ingram testified that about 8:30 a.m. on the morning of June 25, 2003, she was on her way to the Super S grocery store in Goliad, Texas, when she noticed that a small house near the store was on fire. She asked the store manager to call the fire department. Ingram ran to the house to help and encountered a man, later identified as L.N. Garcia, and a young boy, later identified as John Michael Mills, the son of Patricia and appellant. Ingram was unable to get into a door at the back of the house because that door was padlocked. She looked for a hose to help extinguish the fire, but the only hose was "all chopped up." Ingram remained at the scene until after the fire department extinguished the fire. Eventually, appellant, who had been at work, arrived and stood outside talking to others. Ingram testified that appellant did not appear concerned that his wife had died in the fire.

L.N. Garcia testified that he was driving by the area that morning and noticed the fire. As he approached the house, he saw a young boy, later identified as John Michael, then six years old, jump out of a window of the burning house. The boy, who tried to go back into the house, said that his mother was inside. Garcia took the boy a safe distance away from the house. Others ran to the scene to help, but no one was able to get inside.

Alonzo Morales Jr., chief of the Goliad Volunteer Fire Department, testified that he responded to the report of the fire at the Mills residence. Within fifteen or twenty minutes, the fire was extinguished. When the firemen entered the house, they found Patricia's

2

body. They found no smoke detectors in the house.

Jennifer Burdette, Patricia's niece, testified that at the time of Patricia's death, she was twelve or thirteen. In March of 2003, a few months before the fire, she stayed at Patricia and appellant's house during spring break. She testified that during her stay, the smoke detector in the kitchen went off, and appellant changed the batteries. Jennifer testified there were four smoke detectors in the house, although she only knew that the one in the kitchen worked. Jennifer observed Patricia and appellant arguing and stepped between them after appellant hit Patricia. Jennifer stated that the back door to the house was always padlocked. Although the house was wired for electricity, appellant used fuel lanterns for light to save electricity.

Justin Burdette, Patricia's nephew, testified that appellant and Patricia often argued and that appellant often shoved and hit Patricia. He observed these fights on ten or more occasions when he would spend the night at their house. When Patricia would threaten to leave appellant, appellant would say that Patricia could only leave when she was dead. Justin heard appellant make this statement to Patricia about seven years before the fire. Justin knew that appellant was a registered sex offender, but said they were never left alone with appellant. Justin testified that appellant used Coleman lanterns to save on electricity. According to Justin, there was only one smoke detector in the house, in the kitchen, but it never worked.

Jessica Burdette, Patricia's niece, testified that appellant verbally abused Patricia, but she did not see any physical abuse when they lived in Goliad. Earlier, when appellant and Patricia lived in Wharton, she observed appellant physically abusing Patricia "a lot." When she was about ten or eleven, she saw appellant chasing Patricia and her mother with an iron skillet. Patricia visited Jessica at Jessica's home in Seadrift about a month

3

before she died. Patricia seemed very upset. Eventually, Patricia told her that she had walked in on appellant and another woman, Allison Mills (appellant married Allison shortly after Patricia's death), and saw them on the couch. Patricia told appellant that if he wanted to be with Allison, she wanted a divorce. That same day, appellant stated (in Jessica's presence) that he told Patricia that he would kill her before he would give her a divorce and pay child support. According to Jessica, the night of the fire, appellant was "very angry" that his son, John Michael, had survived the fire. Appellant said he wanted to know "how in the hell [John Michael] got out" because appellant had "[p]lexiglassed those windows so thick that even a grown man couldn't have broke it." Jessica remembered that John Michael's toy box (which was found outside the window after the fire) was usually kept outside. According to Jessica, appellant would occasionally throw it outside.[1]

Richard Wiley, Patricia's brother, testified that he was "real close" to Patricia and that they talked regularly on the phone. Patricia told Richard that appellant regularly beat her and that she did not leave appellant because she was afraid of him. A few days before her death, Patricia spoke to Richard on the phone. She told him that appellant had threatened her, saying that the only way out of the house for her was in a body bag. Patricia told Richard about catching appellant sleeping with Allison. Richard offered to come pick up Patricia. On cross-examination, Richard admitted that he heard appellant say several times that the only way Patricia would leave him is in a body bag.

Dean Shirley, an investigator with the state fire marshal's office, testified that he investigated the fire at the Mills' residence. Shirley testified that he was unable to

---

[1] The location of the toybox outside led to speculation that either Patricia or John Michael used the toybox to dislodge the window. This theory could not be verified, however, because testimony showed that the toybox was sometimes inside and sometimes outside the residence.

4

determine what caused the fire, but that he was able to determine that the fire originated in the living room, where the remains of a Coleman lantern were found. The Coleman lantern was missing a cap on the base of the lantern. Shirley testified that Coleman lanterns run on a white gas that is very flammable. According to Shirley, Coleman lantern fuel typically must be ignited by an open flame, like a candle. The origin of the fire was in front of the only door to the house that was operational.[2]

On cross-examination, Shirley admitted that he did not collect or analyze the carpet, rugs, electrical wires, lanterns or other items. Shirley testified that he ran some tests to determine if the fire could have been started the way that Allison later reported that appellant told her he started it.[3] The tests showed that the fire could not have been ignited that way. Shirley admitted that the fire was classified as "undetermined" because he could not determine the cause of the fire.

On redirect examination, Shirley testified that if a lit candle was placed in a pool of lantern fluid, the candle would burn down and ignite the fluid, and that nothing would be left after the fire. Shirley agreed that "you don't have to be a rocket scientist" to devise a "myriad of ways a person with evil intent could delay a fuse to start a fire with an open flame in a Coleman lantern fluid." Shirley agreed that finding a Coleman lantern with the cap off near the origin of the fire was a "suspicious circumstance."

Sharon Burdette testified that Patricia was her sister. Sharon and her husband and family raised John Michael since the day of the fire. Sharon observed bruises on Patricia from the beginning of her marriage to appellant. Sharon stated that appellant

---

[2] A second front door, leading to the master bedroom, could not be used because the placement of the bed in the bedroom blocked the door.

[3] Allison did not testify at trial. The record does not identify what Allison reported regarding what appellant told her about starting the fire.

5

treated John Michael "like a stepchild." When John Michael was less than an hour old and was crying, appellant threatened to throw him out the window. At one point in 1999, Patricia left appellant, stayed with Sharon, and filed for divorce. Appellant drove up and down the street threatening to kill all of them. After a few months, Patricia reunited with appellant. Sharon stated that appellant was impatient and physically abusive to John Michael. Approximately six months before the fire, Allison moved into appellant and Patricia's home and lived there for about a month.[4] In the months before Patricia's death, appellant would drop Patricia off at Sharon's home and meet with Allison on the excuse that she owed them money. According to Sharon, appellant later admitted that Patricia had kicked Allison out of the house because she feared that appellant and Allison were having an affair. Appellant also admitted that he and Allison were having an affair.

Sharon learned about the fire at about 11:30 a.m. and went to Goliad. According to Sharon, appellant did not show any emotion. He told Sharon that he and Patricia had argued that morning because he did not want to go to work. Appellant asked Sharon to take custody of John Michael, saying that he and Patricia had discussed John Michael's future if anything happened to either of them. Appellant initially told Sharon he did not have life insurance on Patricia, but later told her there was a $5,000 policy. Sharon eventually learned that appellant was the beneficiary of a $15,000 life insurance policy; $3,000 was automatically deducted from the proceeds by the insurance company for funeral expenses, but appellant spent the remainder buying a new truck. Sharon testified that on the afternoon of the fire, the fire chief called to ask appellant about the lanterns in the house. Appellant told the fire chief that the lanterns were only used for decoration.

---

[4] Appellant married Allison two months after Patricia's death. By the time of trial, however, they were divorced and appellant was married to another woman, Kayla.

6

The night following the fire, appellant "kept repeating" in a "complaining" tone that he did not understand how John Michael had gotten out "because [he] had the Plexiglass so thick and caulked so thick that nobody could raise it up, much less bust it out."

Sharon explained that the day after the fire, John Michael was anxious about whether Sharon's home was equipped with smoke detectors. Although Sharon's home was not equipped with smoke detectors, she told John Michael that the home had smoke detectors in order to calm his anxiety. John Michael told her that he had a smoke detector in his room, although appellant said that he had removed the smoke detector because it did not work. Sharon testified that in the days and weeks following the fire, appellant began spending time with Allison. In early August, appellant told Sharon that he was marrying Allison, and that she and her husband could have custody of John Michael.

Jimmy Newman, Allison's ex-husband, testified that he and Allison divorced because Allison was involved in an affair with appellant. In 2007, when Newman was visiting appellant and Allison to see his children, he overheard appellant arguing with Allison. Appellant said to Allison, "bitch, if you mess with me again, I'll burn you up in this goddamn house like I did my first fucking wife." Appellant then said, "I'm serious about this here. That bitch needs to be gone too just like the other one." According to Newman, appellant was not joking, but was "angry." At that time, Allison told appellant, "Shut up, get back in the house. I already know what you done. [sic] You're going to get yourself in more trouble."

Frank Freeman, a retired corrections officer, testified he had known appellant about twelve or thirteen years. Appellant was a friend of Freeman's girlfriend. At one point, appellant, Allison, and Allison's children were living with Freeman and his girlfriend. At the time, Freeman and his girlfriend were experiencing financial problems. On two

7

different occasions, appellant told Freeman that he "knew how to start a fire and not be caught and we could collect the insurance." Appellant said he would charge Freeman $10,000 out of the $65,000 insurance proceeds.

Joaquin Cantero was appellant's cellmate in the Goliad County Jail for about three months. According to Cantero's testimony, during that time, appellant occasionally made phone calls to Kayla, appellant's wife at the time. Sometimes, when appellant was angry after the calls, he remarked that "she knows what he's capable of." On many occasions, once when he was discussing Patricia's death in the fire, appellant said "when there's a problem, you have to eliminate it." Appellant told Cantero that before he was arrested, he thought he had gotten away with the murder. On cross-examination, Cantero said that about halfway into his three months as appellant's cellmate, he volunteered to talk to officers about appellant because he wanted appellant moved and was alarmed by what appellant was saying. He stated he was not promised anything in exchange for his testimony.

Keisha Ringland testified that she knew appellant through Allison. Ringland has known Allison since 2002 when she babysat for Allison's children. She did not have much contact with Allison between 2002 and 2006 because Allison had moved to Bloomington, Texas. She became reacquainted with Allison in July 2006 when Allison was married to appellant. Ringland and her husband asked appellant and Allison to be godparents to their son. In November 2007, Ringland got into a physical fight with her husband and left. She visited with Allison and appellant to seek advice. Ringland told them she was worried about a divorce and about custody issues with her young son. Appellant said she did not have to go through a divorce because he knew a way to get rid of Ringland's husband in a way that would appear to be an accident and the police would not know they were

8

involved. Appellant said he could set the apartment complex on fire while Ringland's husband was there and it would appear to be an accidental fire. When appellant mentioned the fire, Allison looked very serious and very worried. Allison told appellant to shut up. When Ringland asked what was wrong, Allison said that appellant's first wife had died in a fire. When Ringland looked at appellant, he was smirking; he did not look sad. Appellant smiled at Ringland and said, "Yeah, and I got away with that shit, too." Appellant was laughing about it.

Ringland stated that at least six months earlier, before she learned of Patricia's death in a fire, she was at appellant and Allison's home and overheard appellant threatening Allison. Appellant told Allison that if she was thinking about divorcing him, that he would set the apartment on fire when they were asleep and kill her and her children. After November 2007, when appellant admitted killing Patricia, Ringland said she was very scared of appellant and stopped visiting appellant and Allison's home. Ringland testified that she begged Allison to divorce appellant, which she eventually did in August 2008. At the time Allison filed for divorce, appellant was incarcerated.

Sherrie Dunnell testified that she is a friend of Patricia's sister, Sharon. About a month after the fire, Sherrie, her husband, and their children were staying at the home of Allison's mother. Allison and appellant came over late one evening. Appellant and Sherrie's husband were outside talking, and Sherrie overheard them talking about the fire. Appellant told her husband he had put boxes against the door so Patricia "couldn't get her fat ass out." Appellant had apparently been drinking. He said he had never loved Patricia but had married her because she was pregnant with John Michael. Sherrie testified that appellant said that on the morning of the fire, he had turned on the gas and laid a cigarette next to the gas and forgot where he had put the cigarette. Appellant also

said he had put candles around the house. Appellant said he and Allison were getting married soon so that neither of them could be forced to testify against the other for Patricia's murder. Allison was not present when appellant made the statement. Sherrie testified that when Allison came out, she said she was glad "the bitch" was dead so she could now marry the love of her life. At one point, Sherrie asked appellant if he realized that he had admitted to killing Patricia. Appellant said that he had not said that, but he did not care because the police could not pin the murder on him. Sherrie testified that after appellant and Allison left, she and her husband talked about what appellant had admitted. Sherrie told her husband that she was going to tell Sharon.

The defense presented Richard Sparks's testimony. Sparks had known appellant and Patricia for six months to a year before the fire. Appellant and Patricia were customers of a laundromat owned by Sparks. He testified that he saw the fire. EMS, the fire department, Sparks, and others were at the scene of the fire when appellant arrived. Sparks said that appellant was very emotional and distraught.

Robert Ludwick testified that he worked with appellant at a backhoe service and septic tank plant in Goliad. On the day of the fire, when appellant was told that his house was on fire, he left work so fast he almost had a wreck. Ludwick stated that the route from Goliad to the workplace takes fifteen to twenty minutes.

The State presented several rebuttal witnesses. Tod Reed, a Texas Ranger, testified that he was involved in interrogating appellant. During the interrogation, appellant appeared to be emotional, but was not crying. According to Ranger Reed, he felt that appellant was trying to display some emotion but was "faking it."

The State recalled Sharon Burdette. She stated that between the time of the fire and February 2004, appellant had only sporadic contact with John Michael. John Michael

10

would cry and did not want to be with appellant. She testified that John Michael did not like Allison either. After February 2004, appellant had no contact with John Michael.

At the close of evidence, the trial court found appellant guilty and, after considering punishment evidence, sentenced him to life imprisonment.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact finder could have found guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plural. op.) ("[T]he *Jackson* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."). This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through 2013 3d C.S.) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . ."). Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the fact finder reached a rational decision. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable. *Id.* at 523.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.

11

Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240. As authorized by the indictment in this case, the State was required to show that appellant (1) intentionally and knowingly (2) caused the death of Patricia Mills (3) by intentionally and knowingly (4) causing a fire at her residence (4) that resulted in her death.

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw through 2013 3d C.S.). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A defendant's intent, in particular, may be inferred from his words, acts, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In other words, intent and knowledge are fact questions and are almost always proven through evidence of the circumstances surrounding the crime. *Robles v. State*, 664

12

S.W.2d 91, 94 (Tex. Crim. App. 1984). Finally, we note that both the identity of the accused and the corpus delicti of an offense may be proven by circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *see also Wheeler v. State*, 35 S.W.3d 126, 134 (Tex. App.—Texarkana 2000, pet. ref'd); *Clark v. State*, No. 13–10–00496–CR, 2011 WL 3821055, at *4 (Tex. App.—Corpus Christi Aug. 25, 2011, no pet.) (mem. op., not designated for publication).

## III. DISCUSSION

By a single issue, appellant contends that, because the evidence shows that the cause of the fire was undetermined, the evidence is therefore insufficient to establish that the fire was started intentionally or knowingly. Appellant argues that, for cases where there is no confession, "the State cannot rely solely on evidence of motive and opportunity [to] prove the element that a criminal act had been committed to cause the death of another."

It is undisputed that the cause of the fire was "undetermined." Investigator Shirley, of the State's Fire Marshal's Office, testified that the cause of the fire was "undetermined." Similarly, the defense submitted the reports of two experts, Ricky S. Jones, fire marshal for the city of Denton, Texas, and Mark Goodson, a professional engineer, each of whom opined that the cause of the fire was "undetermined." In his report, Goodson stated that "[t]he cause of the fire was not properly investigated." Goodson was critical of the fact that the electrical system and appliances were not reviewed.

In closing argument, defense counsel argued that it "would be an outrage" to "convict somebody of intentionally, knowingly causing a fire if the cause of the fire is undetermined[.]" The State responded by calling the trial court's attention to *Clark v. State*, in which this Court found the evidence sufficient to support the defendant's

13

conviction for arson even though the cause of the fire was undetermined. *See* 2011 WL 3821055 at *5. In *Clark*, a jury found Clark guilty of burning a trailer owned by Naranjo. We made the following observations:

> In this case, the jury heard the following evidence: (1) Clark had previously told others about his propensity to burn things when he was mad at someone; (2) on the day in question, Clark had been involved in an argument with Naranjo; (3) Clark returned to the trailer just before the fire began to collect his things; (4) Clark was in a hurry to leave Naranjo's property just at the time the fire would have been started; (5) Clark was in a hurry to get far away from the area—first to Cuero, then to the bus station in order to leave the state; and (6) Clark admitted to a friend that he started the fire. Though the evidence was circumstantial, the jury was permitted to make reasonable inferences based on Clark's conduct and the circumstances surrounding the fire, including inferences regarding his intent to destroy Naranjo's property. Accordingly, when viewed in the light most favorable to the prosecution, this evidence was sufficient for the jury to find Clark guilty of the indicted offense beyond a reasonable doubt.

*Id.* at *3 (citations omitted). Clark had admitted to an ex-girlfriend that he had burned down one of Naranjo's houses. *Id.* at *2. This Court found that, even with an undetermined cause of the fire, Clark's presence at the trailer at the time the fire must have started, his flight from the scene, and the other circumstantial evidence, along with his confession, was "sufficient to support the finding of the corpus delicti." *Id.* at *4.

Appellant argues that *Clark* is distinguishable because: (1) Clark was at the scene of the fire when the fire likely started, whereas appellant was at work; and (2) appellant did not confess to starting the fire. We are not persuaded that these distinctions are significant. Clark did not confess to arson; rather, as in the present case, he admitted the crime to an ex-girlfriend. *Id.* at *2. And although appellant was at work by the time the fire was discovered, the State suggested that there were several scenarios whereby the spread of the fire could have been delayed.

14

The trial court heard evidence that: (1) Patricia had discovered that appellant was having an affair with Allison and had threatened a divorce; (2) appellant had told Patricia he would kill her before he gave her a divorce; (3) appellant was angry and perplexed that John Michael escaped the fire because appellant had plexiglassed and caulked the window; (4) no smoke alarms were found in the house although there was evidence that at least two smoke alarms were there earlier; (5) the garden hose could not be used to extinguish the fire because it had been chopped up; (6) appellant admitted that he had argued with Patricia the morning of the fire; (7) a Coleman lantern of the type appellant typically used was found at the origin of the fire with the cap removed; (8) appellant initially told the fire chief that the lanterns were only decorative; (9) appellant first lied about having a life insurance policy on Patricia, then later collected on the policy and used the proceeds to purchase a new truck; (10) appellant married Allison two months after Patricia's death, in part to ensure he was protected by the spousal privilege; (11) appellant threatened to burn Allison like he burned Patricia; (12) appellant told Freeman that he knew how to start a fire and collect insurance without being caught and offered to start the fire for $10,000; (13) appellant offered to get rid of Ringland's husband by setting the apartment complex on fire and said the police would think it's an accident; (14) appellant admitted that he "got away with" killing Patricia and was laughing about it; (15) Ringland heard appellant threaten Allison, telling her that he would set the apartment on fire and kill her and her children; and (16) appellant told Dunnell that the morning of the fire, he turned on the gas and laid a cigarette next to the gas and left candles burning in the house.

When viewed in the light most favorable to the prosecution, this evidence was sufficient for the trial court to find appellant guilty of murder beyond a reasonable doubt.

15

*See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 895; *see also Carrizales v. State*, 397 S.W.3d 251, 256 (Tex. App.—Corpus Christi 2013), *aff'd on other grounds*, 414 S.W.3d 737 (Tex. Crim. App. 2013) (finding circumstantial evidence sufficient to convict appellant of criminal mischief); *Shiner v. State*, No. 13-11-00730-CR, 2012 WL 5593224, at *4 (Tex. App.—Corpus Christi Nov. 15, 2012, no pet.) (finding only circumstantial evidence sufficient to support conviction for arson). We overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
29th day of August, 2014.

16